## Conner, Sheriff v. Parsley.

(Decided November 18, 1921.)

### Appeal from Boone Circuit Court.

1. Taxation—Inheritance Tax.—The provision in subsection 2, section 4281a, Kentucky Statutes, in which there is a classification of persons subject to an inheritance tax, embracing "any child to whom such decedent for not less than ten years prior to such transfer stood in the mutually acknowledged relation of a parent, provided such relationship began at or before the child's fifteenth birthday and was continuous for said ten years thereafer," includes not only the natural or bastard children of the testator but any child, whether related to him by blood or not, to whom he has sustained that mutually acknowledged relation for the length of time prescribed, if the relationship was begun before the child's fifteenth birthday.

2. Injunction—Parties.—An injunction operates upon the person of one proceeding to do an unlawful act whether he be acting as principal or agent, and if he be acting as agent only it is not necessary that his principal should be a party.

3. Officers—Deputies and Assistants.—A deputy of a clerk or sheriff should perform his official acts in the name of his principal, but his failure to do so does not necessarily invalidate his official act.

4. Clerks of Courts—Deputies and Assistants—Oath.—The presumption of law in the absence of anything to the contrary is that one signing himself as a deputy clerk is such deputy, and the valid-

ity of an oath administered by such deputy is not affected by his faulty certificate thereto.

5. Statutes—Construction.—The reading of words into statutes by interpretation is only resorted to by the courts where there is some ambiguity or uncertainty in the language of the act itself, and then only for the purpose of reaching the plain legislative intent.

6. Statutes—Construction by Courts of Another State.—While the courts of this state, where its legislature has adopted in terms a statute previously passed by another state, are not bound by the interpretation of the courts of such other state, such interpretation by the courts of that state before the enactment in this state, are treated as very persuasive and will ordinarily be followed.

7. Statutes—Presumption that Legislature Had Knowledge of Decisions of another State.—The legislature is presumed to have had in mind when adopting the statutory language of another state, existing decisions of that state interpreting the language, and to have used the same language in the sense thus indicated.

B. H. RILEY for appellant.

M. F. LYONS, CHARLES STROTHER and J. M. LASSING for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Affirming.

The appellee filed this equitable action seeking to enjoin the sheriff of Boone county from collecting and the executor of W. H. Senour, deceased, from paying an inheritance tax of five per cent of the value of a devise to the plaintiff in the will of Senour, and claiming she is only liable for a tax of one per cent.

The question involves the interpretation of subsection 2, section 4281a, Kentucky Statutes, where there is a classification of the persons subject to an inheritance tax and classifying them so as that the rate of taxation varies from one per cent of the fair market value of the inheritance to five per cent, and it is conceded appellee either is in classification A, against whom only a one per cent tax is assessed, or classification E, from whom a five per cent tax may be collected.

The statute puts in class A:

"The husband, wife, lineal issue, lineal ancestor of the decedent, any child adopted as such in conformity with the laws of this Commonwealth, any child to whom such decedent for not less than ten years prior to such transfer stood in the mutually acknowledged relation of a parent, provided such relationship began at or before the child's fifteenth birthday and was continuous for said

ten years thereafter, or any lineal issue of such adopted or mutually acknowledged child,''

And puts in class E:

''A person related in any other degree of collateral consanguinity than is mentioned in one of the preceding classes, a stranger in blood, or body politic or corporate.''

The plaintiff alleged that in March, 1868, when she was six years of age, her mother, Emily Ellis, then a widow, married W. H. Senour, and thereafter she and her mother continuously resided with Senour at his home in Boone county until the plaintiff was eleven years old, at which time her mother died; that a short time before the death of her mother she gave and committed this plaintiff to W. H. Senour, her husband, and requested him to rear, support and educate said child as and for his own child for every purpose and in every sense except that of blood relationship; that Senour accepted said gift and trust and did rear, support, nurture and educate plaintiff continuously from the date of gift and commitment and he and the plaintiff mutually acknowledged and regarded each other as parent and child for the purposes aforesaid, and that sacred and intimate relationship between them continued mutually and continuously from the date of the gift and commitment until the death of Senour on the 12th of January, 1920; that in virtue of the gift and commitment Senour uniformly addressed the plaintiff as daughter and she, in turn, addressed him uniformly as father; that because of the relationship so created and continued and because of the recognition by Senour of the obligation imposed upon him he gave to the plaintiff in his last will and testament about one-third of his whole estate, amounting to twenty-six thousand dollars in value.

That the estate was in the hands of the defendant executor and in process of distribution and settlement, and the defendant sheriff, as agent of the Commonwealth of Kentucky, was demanding of the executor the immediate payment of the inheritance tax due by plaintiff to the Commonwealth at the rate of five per centum of the value of the devise as if this plaintiff was a member of classification E in the Kentucky Statutes, whereas the plaintiff avers that she belongs to classification A, which imposes upon her only a tax of one per centum on the amount of the devise. The plaintiff further alleges that unless they are enjoined the defendant sheriff will exact from the defendant executor the payment of the tax at the rate of

five per centum and the defendant executor will be compelled to pay same.

The defendant sheriff filed both a special and a general demurrer to the plaintiff's petition, each of which was overruled, and there being no answer filed, upon a submission the court perpetually enjoined the sheriff from collecting and the executor from paying any part of the tax in excess of the one per cent, thereby, in effect, adjudging that the plaintiff belonged to classification A, and the sheriff has appealed.

The classification in question was made for the first time in this state in an act approved March 20, 1916, providing for a progressive tax on direct and collateral inheritances.

The special demurrer was filed upon the idea that the state tax commission was a necessary party to this suit. But we find nothing in chapter 44, Acts of 1920, which makes that commission a necessary party. The allegation in the petition here is that the Commonwealth of Kentucky, through its agent, the sheriff, is demanding of the executor the immediate payment of the tax at the rate of five per cent, and that if such collection is permitted at that rate the plaintiff will suffer great and irreparable damage because it is greatly in excess of the amount due under the law, and unless enjoined the executor will be compelled to pay at the rate of five per cent.

The sheriff is himself the collecting agent of the Commonwealth of Kentucky and authorized by law to collect inheritance taxes and we can see no necessity in an action for injunctive relief to test the validity of a tax demanded by a tax collector, of making any other agency of the state than the one attempting to collect the tax a party to the suit. It was the sheriff who was undertaking and proceeding to collect what the plaintiff conceived to be an illegal tax and he was the only agent of the Commonwealth sought to be restrained from collecting the same, and it would have been a useless procedure to have associated with him other agencies of the state and restrain them from doing something which they were not undertaking to do so far as this record discloses. An injunction operates upon the person of the one proceeding to do an unlawful act, whether he be acting as principal or agent, and if he be acting as agent only it is not necessary that his principal should be a party.

The appellant sheriff entered in the lower court a motion to dissolve the injunction upon the face of the papers,

which was overruled by the court, and he complains of this action because he says there was no affidavit filed before the granting of the injunction and that the certificate to the jurat purporting to certify to the oath of appellee is void because it is only a certificate of one signing himself as "A. R. Johnson, D. C. B. C. C.," and that such certificate is void because not signed in the name of the principal for whom Johnson purported to be acting.

The general rule is that the deputy of a clerk or sheriff should perform all of his official acts in the name of his principal, but to hold that if he fails to do so and only signs his name as deputy without the use of the name of his principal, his act would be void, is in contravention of the provisions of section 678 of the Civil Code, providing that any duty enjoined upon a ministerial officer, or any act permitted to be done by him, may be performed by his deputy.

The presumption of law in the absence of anything to the contrary is that one so signing himself is such deputy unless the contrary be shown. Humphrey's Executor v. Wade, 84 Ky. 391; 7 Cyc. 250 (note).

Whether Johnson was a deputy county clerk or a deputy circuit clerk is immaterial; in either capacity he had the right to administer the oath. The essential thing is was the oath administered, as it appears to have been, and not whether the official administering the oath properly signed his certificate thereto.

The validity of the oath administered is not affected by the officer's faulty certificate, and there is nothing in the record to overcome the presumption of law that he was a deputy clerk and therefore had the right to administer the oath.

We come then to the real question in the case and that is whether appellee, under the allegations of her petition, should be in class A or class E.

This classification was first made in Kentucky in 1916 and is made in a revenue-producing statute and in no way affects or undertakes to affect any of the statutes of descent and distribution. Its plain purpose was to levy an inheritance tax upon persons receiving property by devise from others, and to graduate the tax so as to make the different classes there designated pay at a different rate; that is, to require only a small tax from those persons who occupied toward the testator the closest relationship, while it demands of persons not occupying such relationship a higher tax, as shown in the act.

The appellee was the stepchild of the decedent and sustained no blood relationship to him, nor had she ever been legally adopted by him; but when she was eleven years old her mother, who was the wife of the decedent, died and from that time until the death of Senour in 1920, a period of more than forty years, he had supported, nurtured and educated her, and they had mutually sustained the artificial relation to each other of parent and child as completely as an artificial relation of that sort may be created.

The question is whether the legislature intended by its classification A to embrace "any child" to whom the decedent had for a period of ten years stood in the mutually acknowledged relation of a parent if such relationship had begun before the child's fifteenth birthday, whether that child bore to him any blood relationship or not, or whether the words "any child" should be confined to the testator's bastard or natural children.

There are two controlling reasons why we cannot restrict this language to have application only to bastard children:

(1) The language of the statute is plain and unambiguous; by its terms it embraces "any child" who has for the prescribed time stood in the mutually acknowledged relation of parent and child to the decedent, if that relationship is begun before its fifteenth birthday. The language is not restricted to "any child" of the testator, or "any child" of the decedent, but is "any child to whom such decedent" has sustained those relations.

That it was not the legislative purpose by the use of this language to restrict the class to those bearing blood relationship to the decedent is plain from the provisions of the very preceding clause of the act wherein it expressly embraces in class A "any child adopted as such in conformity with the laws of this Commonwealth" and thereby placed in that class such adopted children whether they bore to the decedent blood relationship or not. But not being satisfied with embracing in the classification adopted children, whether related by blood or not, in the very next clause, the one under consideration, it proceeds to classify therein an additional class who may not be related by blood. It apparently had in mind the classification not only of "any child" adopted legally by the decedent without regard to blood relationship, but another class, whether legally adopted or bearing blood relationship to the decedent or not, viz.: that class of children to whom

the decedent had in his lifetime sustained the relation of a parent, if that relationship had been begun in the infancy of the child and continued for ten years.

In other words, the legislature had in mind to place in the most favored classification for the purposes of the tax not only those persons who had been legally adopted by the decedent, although they bore no blood relationship to him, but that additional class who, although not legally adopted and bearing no blood relationship, had from infancy borne to the decedent, for the length of time prescribed, that close, tender and affectionate relationship growing out of the association by the infant with the decedent, which relationship often approaches in its tenderness and genuine affection almost the relationship of real parent and child.

If this classification had been intended to apply only to bastard or natural children of the testator the language of the statute would have necessarily been much simpler, and we must assume that if that had been its only purpose it would have placed them in the favored classification without hedging them about with all these conditions and restrictions. If the favorable classification had been intended only for bastards the necessity for all this circuitous use of language is not apparent; but if it was the legislative purpose to embrace not only natural children but also another class who bore no blood relationship to the decedent and had not been lawfully adopted by him, it then became necessary to use the language that has been used, that such latter class might be embraced.

The statute in question is purely a revenue statute and has no connection with the statutes of descent and distribution, and the courts will interpret these various classifications in a reasonable way so as to give effect to the legislative purpose. The legislature knew what is a matter of common knowledge, that in many families infants are taken in and reared, trained and educated by persons who bear no blood relationship to them, and in many instances without knowing who they are or whence they came; it, likewise, knew that in many instances such infants occupy in the hearts and minds and thoughts of those who rear and nurture them a place second only to their own legitimate children. And it further knew from the common experience of men that always such children are not adopted according to law and it, therefore, gave the benefit of this favorable classification not only to those

who were so adopted, but to those sustaining in effect the same relationship to the decedent but who had not in fact been legally adopted.

The language of the classification that "any child to whom such decedent . . . stood in the mutually acknowledged relation of parent" by its very terms embraces a larger class than mere bastards, for it seems to contemplate by the use of the language "mutually acknowledged relation of parent" the creation of the artificial relationship of parent and child in the manner prescribed by the statute for the purposes of this taxation. If it had been the intention to embrace only bastards or natural children by that classification the language necessarily would have been "any natural child" and to read that word "natural" into the statute would be such a restriction of the class as the courts are unauthorized to make.

Courts will and do sometimes, read words into statutes, but this is resorted to only where there is some ambiguity or uncertainty in the language of the act itself, and then only for the purpose of reaching the plain legislative intent. But here we have no ambiguity and no uncertainty; the language used is broad enough to embrace and does embrace not only any natural child of the testator but "any child" who has for the length of time prescribed sustained to him the artificial relation fixed in the statute for the time and in the manner prescribed. To insert the word "natural" or "bastard" by interpretation in this statute and thereby restrict its operation to that class of children alone, would be a species of judicial legislation which the courts will never resort to in the interpretation of an unambiguous statute.

The classification in class E of "a stranger in blood" can have no effect upon the classification in class A of "any child to whom such decedent . . . stood in the mutually acknowledged relation of a parent," for the very language of classification E embraces only such persons as are not mentioned in any of the preceding classes and we have already seen that there is an express inclusion in class A of adopted children without regard to whether they are related to the decedent by blood, so that the classification "a stranger in blood" in class E cannot be deemed as in conflict with the express classifications in class A wherein some "strangers in blood" are included.

Giving to the language in classification A its plain, commonplace meaning and conceiving it to have been unmistakably the legislative purpose thereby to create an artificial relationship of parent and child for the purposes of this tax, whether there be blood relationship or not, the classification of the circuit court of plaintiff was proper.

The argument for the appellant seems to assume that the correct meaning of the words "child" and "parent" must determine the construction of this statute. In the first place, the word "parent" is used in the statute only as descriptive of the artificial relation created, and the word "child" is not used in respect to or reference to its parentage, but is used in relation to the "decedent" without regard to whether such decedent be the natural parent of the child. If the language had been "any child to whom such parent stood in the mutually acknowledged relation of a parent" there would be great force in the argument, but the word "parent" is used in the statute only when it becomes necessary to describe the artificial relationship of parent and child which the statute creates for the purposes of the tax.

(2) This conclusion is fortified by the interpretation given a statute in almost exactly the same language in the state of New York, and it is further strengthened by the fact that our own legislature adopted this statute from the New York statute, using almost precisely the same language, after that New York statute had been interpreted by the highest court in that state.

The New York inheritance tax law, as amended by the act of 1898, provides that the transfer of property to certain persons therein classified shall not be taxed unless it is personal property of the value of ten thousand dollars or more, and the classification therein includes "any child to whom any such decedent, grantor, donor or vendor for not less than ten years prior to such transfer stood in the mutually acknowledged relation of a parent, provided, however, such relationship began at or before the child's fifteenth birthday and was continuous for said ten years thereafter." In Estate of John W. Davis, 184 N. Y. 299, it appeared that the legatee was a niece of the testator's wife, there being no blood relationship, and the court in holding that the legatee was embraced in the classification, said:

"Upon the enactment of the statute relative to taxable transfers in 1892 (chap. 399) there arose considera-

ble conflict in the decisions of the lower courts as to what was necessary under the provisions of the statute to constitute 'the mutually acknowledged relation of parent.' In some courts it was held that this provision comprehended only the case of illegitimate children. The proper construction of the statute was settled by this court in Matter of Beach (154 N. Y. 242) where Chief Justice Andrews, writing the unanimous decision of the court, said: 'The clause, we think, was intended to have a broader scope; to include, among others, those cases, not infrequent, where a person without offspring, needing the care and affection of some one willing to assume the position of a child, takes, without formal adoption, a friend or relative into his household, standing to such person in *loco parentis,* or as a parent, and receives in return filial affection and services.' In that case the legatee who had been denied the reduced rate of taxation by the lower court was a married lady of middle age living with her husband. They had resided for the statutory period with the testator in his house, and the legatee had managed the household affairs of the testator. The evidence to support the legatee's claim of exemption was found in very brief affidavits, in which it was averred that the testator had stated that the legatee was his adopted daughter, and also his promise that he would treat her as a daughter. It does not appear in what terms the legatee and testator addressed one another. On these facts the court, reversing the courts below, held that there existed between the parties the 'mutually acknowledged relation of parent.' After the decision in the Beach case the legislature amended this section of the statute by inserting the qualification now found, 'provided, however, such relationship began at or before the child's fifteenth birthday and was continuous for said ten years thereafter.' (Chap. 88, laws 1898). This amendment was intended to exclude persons from the benefit of the section unless the relationship was formed in the tender years of the legatee, but except as thus modified the decision in the Beach case remains in full force.''

There are many other cases in New York upholding this view of the statute, under different facts and different circumstances and conditions, but they are so numerous we will not undertake to quote from them.

As recited in the opinion quoted, soon after the first enactment of an inheritance tax law in that state there was considerable difference of opinion among the lower

courts as to the correct interpretation, but, as indicated in that opinion, the final and authoritative interpretation is that which we have given and in the last few years there has been no dissent from it in the courts of New York.   Matter of Beach, 154 N. Y. 242; In the Matter of Butler, 58 Hun. 400; In the Matter of Deutsch's Estate, 107 N. Y. Appellate Div. 192; Capron's Estate, 10 N. Y. Supp. (stepchild), 23; Sweetland's Estate, 20 N. Y. Supp. 310; Wheeler's Estate, 22 N. Y. Supp. 1075; Stillwell's Estate, 34 N. Y. Supp. 1023; Nichol's Estate, 36 N. Y. Supp. 538; In re Nichols, 91 Hun. 134.   The authoritative interpretation of the New York statute, which is in almost the precise terms as our own and from which ours was plainly taken, was had many years before our statute was adopted, and the latter was therefore presumably passed in the light of that interpretation and is in effect a legislative interpretation of the act itself.   While the courts of one state, which has adopted in terms a statute previously passed by another state, will not be bound by the interpretation of the courts of such other state, the interpretation of the courts of that state before the enactment by the sister state are treated as very persuasive and will ordinarily be followed.

As said by the New Hampshire Supreme Court in Mann v. Carter, 15 L. R. A. (N. S.) 150:

"The legislature is ordinarily presumed to have had in mind when adopting the statutory language of another state, existing decisions of that state defining the extent and purposes of the statute, and to have used the identical language in the sense thus indicated."

The judgment of the lower court being in accord with these views is affirmed.

Whole court sitting, Chief Justice Hurt and Judge Clay dissenting.

### DISSENTING OPINION BY JUDGE CLAY.

The question is, does a stepchild, towards whom the decedent assumed the relation of a father, fall within class A, subsection 2, section 4281a, Kentucky Statutes? If the statute read, "Any child to whom such decedent, for not less than ten years prior to such transfer, stood in the relation of a parent," it might be argued with some degree of plausibility that the words included any child towards whom the decedent stood in *loco parentis*.   But the statute does not stop there.   Its language is, "Any

child to whom such decedent, for not less than ten years prior to such transfer, stood in the *mutually acknowledged* relation of a parent." In other words, the relation must be mutually acknowledged, that is, it must be acknowledged as a fact both by the decedent and by the child. What is meant by acknowledging the relation? The statute leaves no room for erroneous interpretation. The words, "Or any lineal issue of such adopted or mutually acknowledged child," make it plain that to acknowledge the relation is to acknowledge the child. What is meant by acknowledging a child? Whether we consult general literature or the law books, we shall find that the word "acknowledge," as applied to a child has always had a definite and fixed meaning understood alike by all. To acknowledge a child is to admit or declare that you are its parent, or to recognize it as your own. In King Lear, which was written more than 300 years ago, we find the following:

"Kent. Is not this your son, my lord?

"Glou. His breeding, sir, hath been at my charge; I have so often blushed to acknowledge him that now I am brazed to it."

Indeed, the words "acknowledge" and "recognize," when applied to a child, are used interchangeably. Section 1398, Kentucky Statutes, provides that if a man, having had a child by a woman, shall afterwards marry her, such child or its descendants, if recognized by him before or after marriage, shall be deemed legitimate, and the word "recognize" has been construed as meaning "acknowledge."

In 5 Cyc. 633, we find the following:

"Recognition or Acknowledgment—a. In General. In some states a child may be legitimated by the recognition or acknowledgment of it by the putative father as his own. The usual requirement of such legitimation is that the recognition or acknowledgment be general and notorious or in writing."

See also 7 C. J. 948 and 3 R. C. L. 741. Not only does the word "acknowledge," when applied to a child, naturally mean a recognition of the child as one's own, but the period of time prescribed by the statute, during which the decedent must have stood in the mutually acknowledged relation of a parent, leaves no room for any other construction. If the legislature had intended that fatherly care and devotion would be sufficient, there would be no reason for discriminating between a child who had

received such attention for five years, and one who had received such attention for ten years. The reason why the decedent was required to stand to the child in the mutually acknowledged relation of a parent for a period of ten years was to make the acknowledgment so long continued and notorious as to remove all doubt as to the existence of the relationship. Since to acknowledge a child is to recognize him as your own, it necessarily follows that kind and considerate treatment, though evidence of an acknowledgment, can never supply the place of an acknowledgment. Though one may acknowledge a child of doubtful parentage, it is a plain contradiction in terms to say that one may acknowledge a child whom he concedes to be the child of another. As plaintiff was the stepchild of decedent, it necessarily follows that the decedent never stood to her in the mutually acknowledged relation of a parent. On the contrary, he was her stepfather in fact, and this fact being known and admitted by both, it was never possible for them to acknowledge a different relationship. I am therefore of the opinion that plaintiff falls in class E as "a stranger in blood," and not in class A.

I am authorized to say that Chief Justice Hurt concurs in this dissent.