**Nickolas STAPLES, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2011–SC–000788–MR.

Supreme Court of Kentucky.

April 17, 2014.

Rehearing Denied Oct. 23, 2014.

Brandon Neil Jewell, Assistant Public Advocate, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Jason Bradley Moore, Assistant Attorney General, Counsel for Appellee.

## OPINION OF THE COURT BY JUSTICE ABRAMSON

ABRAMSON, Judge.

Nickolas Staples appeals as of right from a Judgment of the Butler Circuit Court convicting him of first-degree manslaughter (Kentucky Revised Statute (KRS) 507.030) and first-degree criminal abuse (KRS 508.100) and sentencing him as a second-degree persistent felon (KRS 532.080) to a maximum term of twenty-five years in prison. The Commonwealth accused Staples of having caused, either alone or in conjunction with his girlfriend, Brittany Garcia, serious physical injury to and ultimately the death of Garcia's five-month old daughter, Angel Tucker. Garcia was similarly charged, and, following their joint trial, was convicted along with Staples of first-degree manslaughter and first-degree abuse. Because Staples, who lived with Garcia and Angel and who regularly cared for Angel, was not the child's legal custodian and had not attained *in loco parentis* status, he insists that he had no legal duty to intervene and prevent Garcia from either seriously injuring or killing her child. If this is correct, any criminal abuse or complicity to manslaughter conviction based on a legal duty owed by Staples would be unsustainable as a matter of law. However, as explained in detail below, we conclude that the Kentucky General Assembly deliberately chose the words "actual custody" for the criminal abuse statutes, and that actual custodians include those adults, like Staples, who cohabit with another adult and that person's minor child and who share substantial responsibilities with the parent for the child's day-to-day necessities such as food, shelter, and care. While not *legal* custody, this type of relationship constitutes *actual* custody and gives rise to a duty to protect the child under the Kentucky Penal Code. Moreover, as the traditional household of two biological parents residing with their minor children becomes increasingly less common, imposition of criminal responsibility for breach of a duty of care by an "actual custodian" is not only entirely logical but the plain intent of our legislators.

Turning to Staples's contentions on appeal, he maintains that there was insufficient evidence of his guilt to justify the submission of either charge to the jury. He also contends that (1) improper jury instructions, (2) improper remarks by the Commonwealth's Attorney during closing argument, (3) the admission into evidence of autopsy photographs, (4) the admission into evidence of statements Garcia made to police investigators, and (5) a misallocation of peremptory juror strikes all rendered his trial unfair and necessitate a retrial.

Convinced that nothing to which Staples objected at trial or raises on appeal, with one exception, amounted to reversible error, we affirm that portion of the Judgment of the Butler Circuit Court convicting Staples of first-degree criminal abuse and sentencing him as a second-degree persistent felony offender. However, we conclude that an unpreserved error in the first-degree manslaughter complicity instruction misstated the required mental state, and being both palpable and manifestly unjust, necessitates a reversal of Staples's manslaughter conviction and a remand for further proceedings on that charge.

### RELEVANT FACTS

The Commonwealth's proof tended to show that in August 2009, Garcia moved with her two-month-old daughter, Angel, into the Morgantown apartment her new boyfriend, Staples, shared with his mother. Near the end of September 2009, the mother, Karen Staples, moved to a new residence, and Staples and Garcia moved to a new, smaller apartment of their own.

About a month later, on November 6, 2009, Garcia's brother's girlfriend, Angela Briana, was helping care for Angel. Briana testified that at one point she moved to pick up Angel, because she was crying and seemed in pain, but Staples stopped her, explaining that he and Garcia were trying to wean the four-month old child from needing to be held so much. Later, after Staples had left her alone with Angel, Briana lifted her clothes to change her and found what she regarded as serious bruising over much of the child's left ribs. Briana testified that when she asked Garcia what had happened Garcia first claimed not to know, but then claimed that a couple of days before she, while carrying Angel, had fallen down some stairs. Concerned, Briana and her boyfriend (Garcia's brother) contacted Angel's father, James Tucker.

Tucker promptly took Garcia and Angel to the Bowling Green Medical Center. There, Angel was examined and x-rayed, but because the bruising on her chest wall and back appeared to be consistent with Garcia's account of a fall down the stairs, the examiner did not oppose Garcia's taking Angel home. Tucker returned Garcia and Angel to Staples's apartment, and from then until Thanksgiving Staples and Garcia continued to live as a couple with Staples providing, according to his own estimate, forty percent of Angel's care.

Tucker testified that Garcia and Angel spent the Thanksgiving holiday, from the day before Thanksgiving until the day after, with him. During that time, he said, Garcia informed him that she had not really fallen down the stairs with Angel and that she did not know how Angel had been injured. The day after Thanksgiving, Garcia returned to Staples's apartment, and the day after that Staples's mother picked up Angel from Tucker's sister's residence, where Garcia had left her, and returned her to Garcia and Staples.

Two days later, on November 30, 2009, Garcia took Angel to the Health Department for an immunization. The nurse who gave the shot testified that she did not examine Angel, but that nothing she observed suggested anything amiss. Karen Staples testified that she spent that evening with her son and Garcia at their apartment. She left at about 7:00 or 8:00 p.m., at which time, she said, Angel appeared to be fine.

Shortly after 6:00 the next morning, on December 1, 2009, paramedics were summoned to the couple's apartment and there found Angel in a state of cardiac and pulmonary arrest. She was taken initially to the Bowling Green Medical Center, where emergency room personnel were able to

restore vital signs. She was then transferred to the Vanderbilt University Children's Hospital in Nashville. Three days later she was removed from life-support and pronounced dead.

The post-mortem examination, which included x-rays made on December 1, revealed that during the last month or two of her life Angel had suffered numerous broken ribs and a broken clavicle. The medical examiner testified that because the broken bones were at different stages of healing, not all of the injuries had happened at the same time. The rib fractures, according to the examiner, appeared on both the November 6 x-rays taken at the Bowling Green Medical Center and the December 1 x-rays, but the clavicle fracture, which also showed signs of healing, appeared only on the latter, and so must have occurred after November 6 and before December 1.

The examination also revealed a bruise on the side of the child's head. Beneath the bruise there had been massive bleeding into and around the brain and around the top of the spinal cord. The medical examiner testified that a consequent lack of oxygen to the brain was the ultimate cause of death, and that the head injury, which would immediately have been symptomatic and probably debilitating, had been caused by severe blunt force trauma, such as violent shaking or someone's slamming the child's head against the floor or a wall.

The investigating detective testified that he conducted a series of interviews with Staples and Garcia soon after Angel was taken to the hospital, and that they gave changing and initially inconsistent accounts regarding how Angel's ribs were injured— from not knowing, to a fall down the stairs (Garcia), or a fall up the stairs (Staples). After the initial interviews and after the

couple had had a chance to confer, Garcia's account changed to match that of Staples.

A Butler County grand jury indicted Staples in November 2010, on charges of murder, either as a principal or as an accomplice, and of first-degree criminal abuse. Following his arrest on those charges, Staples was lodged in the Butler County Jail. One of his cellmates at the jail testified that Staples confessed to him that he had hated Angel as the child of another man and that he had been rough with her and had squeezed her around her chest. According to the cellmate, when Staples learned that he, the cellmate, had once been employed as a confidential informant in another county, he warned him not to reveal what he had confessed, since, having one death already on his conscience, he did not want to have another.

The Commonwealth also presented evidence that while incarcerated at the jail Staples had had a number of (recorded) telephone conversations with his mother. The gist of more than one of those calls was Staples's request that his mother visit Garcia and tell her "to keep her mouth shut."

Neither Garcia nor Staples testified at trial, but Staples presented testimony by four other cellmates to the effect that the alleged confession was unlikely given the crowded conditions in the cell where it allegedly took place and the reputation of the Commonwealth's witness as an informant. Otherwise, through cross-examination and through argument, Staples emphasized the circumstantial nature of the Commonwealth's case and urged that the circumstances did not add up to proof that he was guilty of anything. At the conclusion of the four-day trial, the jury acquitted both Staples and Garcia of murder, but, as noted, found them both guilty of the lesser offense of first-degree manslaughter as well as of the offense of first-

degree criminal abuse. Our analysis of Staples's allegations of error begins with his contention that he was entitled to a directed verdict of acquittal.

## ANALYSIS

### I. Staples Is Not Entitled To A Directed Verdict.

 As Staples concedes, a directed verdict is required if, but only if, the evidence, construed favorably to the Commonwealth, would not permit a reasonable juror to believe the defendant guilty beyond a reasonable doubt. *Jackson v. Commonwealth*, 392 S.W.3d 907 (Ky.2013) (*citing Commonwealth v. Benham*, 816 S.W.2d 186 (Ky.1991)). Under KRS 507.030(1)(a), "[a] person is guilty of manslaughter in the first degree when ... [w]ith intent to cause serious physical injury to another person, he causes the death of such person." The Commonwealth's proof, as summarized above—proof of the child's numerous injuries; proof that the injuries occurred during the period the child was in Staples's care; proof that Garcia, the other principal caretaker, denied having injured her; and proof that Staples admitted having done so-was sufficient to convince a reasonable juror that, having seriously injured Angel on prior occasions, Staples, late November 30 or early December 1, intended to seriously injure her again, but mistook on that occasion the force he was applying and instead of injury caused the child's death.

 The evidence of criminal abuse was also sufficient. KRS 508.100(1) provides in pertinent part that "[a] person is guilty of criminal abuse in the first degree when he intentionally abuses another person or permits another person of whom he has actual custody to be abused and thereby · ... causes serious physical injury ... to a person twelve (12) years of age or less."

"Abuse" here means "the infliction of physical pain, injury, or mental injury, or the deprivation of services by a person which are necessary to maintain the health and welfare of a person." KRS 508.090(1). The evidence that the five-month-old Angel suffered broken ribs while in Staples's care and Staples's confession to his cellmate that he had squeezed the child's chest, could have convinced a reasonable juror that intending, at the very least, to cause the child physical pain, Staples caused her a serious physical injury. Because the evidence thus adequately raised an issue of guilt as to both offenses and met the *Benham* standard, the trial court did not err when it denied Staples's motion for a directed verdict.

### II. The Trial Court Did Not Err By Instructing the Jury to Consider the Commonwealth's Breach–of–Duty Theories of Complicity to Manslaughter and of Criminal Abuse.

 Staples next contends that the jury instructions with respect to both manslaughter and abuse included a theory of liability not recognized under Kentucky law—the theory that he, a co-habiting non-parent, owed the child a duty to protect her from her mother's abuse—and, because it cannot be said that the jury did not rely on the invalid theory, the tainted instructions deprived him in both instances of his right to a unanimous verdict. With respect to manslaughter, the jury was instructed that it was to find Staples guilty of that offense if it believed beyond a reasonable doubt either that Staples himself killed Angel while intending to cause her serious physical injury, or that

(1) [I]n this county on or about December 1, 2009, ... Brittany Garcia killed Angel Tucker by blunt force trauma;

(2) That in so doing, Brittany Garcia did not intend to kill Angel Tucker but intended to cause serious physical injury to Angel Tucker;

(3) That the defendant [Staples] had actual custody of Angel Tucker;

AND

(4) That at the time of Angel Tucker's death, the Defendant was acting wantonly or recklessly with respect to the risk that Brittany Garcia would inflict death or injury upon Angel Tucker and failed to make an effort reasonable under the circumstances to protect Angel Tucker from such harm.

Staples contends that because he did not, as a matter of law, have a duty to protect Angel from harm, this instruction offered the jury an invalid basis for finding him guilty.[1]

The part of the instruction to which Staples objects is based on KRS 502.020, the complicity statute. Under subpart (2)(c) of that statute,

[w]hen causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he: ... [h]aving a legal duty to prevent the conduct causing the result, fails to make a proper effort to do so.

Staples insists that he had no legal duty to prevent Garcia from killing her child, and thus, if the jury believed that Garcia was the killer, he could not lawfully be found complicit in the killing under the theory reflected in the instructions.[2]

Subpart (2)(c) of the complicity statute is in turn based upon KRS 501.030, the statute codifying the *actus reas* and *mens rea* requirements for criminal liability. That statute provides that

[a] person is not guilty of a criminal offense unless:

(1) He has engaged in conduct which includes a voluntary act or the omission to perform a duty which the law imposes upon him and which he is physically capable of performing;

and

(2) He has engaged in such conduct intentionally, knowingly, wantonly or recklessly as the law may require, with respect to each element of the offense, except that this requirement does not apply to any offense which imposes absolute liability, as defined in KRS 501.050.

This statute is still as originally enacted in 1974, and the Commentary to it explains that with one slight modification it was intended simply to codify the then-existing law:

The principles contained in this section [section 210 of the Kentucky Penal Code, Final Draft, which became KRS

---

**1.** The first-degree criminal abuse instruction provided in part that the jury could find Staples guilty of that offense if it believed that he "had actual custody of Angel Tucker and intentionally permitted her to be abused by Brittany Garcia; ... [and] [t]hat as a result thereof, Angel Tucker sustained a serious physical injury." As will become evident in our discussion below, Staples's duty to protect Angel from fatal injury, as reflected in the manslaughter instruction, and his duty to protect her from serious physical injury, as reflected in the criminal abuse instruction, both arise under the criminal abuse statute. Our discussion of the manslaughter instruction, therefore, will answer Staples's challenge to the criminal abuse instruction as well.'

**2.** As discussed below, there is an error in the complicity instruction as to the required mental state, an issue warranting reversal. That issue is discussed separately.

501.030] are consistent with existing law. Kentucky presently exempts involuntary acts from criminal liability (*Fain v. Commonwealth*, 78 Ky. 183 (1879)); imposes liability upon a failure to perform a legal duty (*Westrup v. Commonwealth*, [123 Ky.95] 93 S.W.646 ([]1906)), and requires a union of act and intention for criminality (*Commonwealth v. Duvall*, [220 Ky.771] 295 S.W.1047 ([]1927)). Section 210 codifies these principles and makes one addition, the reason for which is obvious. Before a person can be held liable for failure to perform a legal duty, he must have been physically capable of performance.

Kentucky Penal Code, Final Draft, p. 18 (Nov.1971).

Under the preexisting law, the sources of legal duties the breach of which could give rise to criminal liability included statutes expressly creating such duties[3] as well as certain relationships in which one person or entity is deemed to have undertaken to act on another's behalf. *E.g., Westrup v. Commonwealth*, 93 S.W. at 646 (recognizing a husband's duty to provide medical assistance for his wife, but ruling that the duty had not been breached where the wife made a responsible decision to forego the attendance of a physician during childbirth); *Lane v. Commonwealth*, 956 S.W.2d 874, 876 (Ky.1997) (Cooper, J., concurring) (discussing the State's duty to provide care and protection for persons in its custody).[4]

The parent-child relationship is one such relationship giving rise to legal duties prior to the adoption of the Penal Code. Parents, under the common law, could be held criminally responsible for injurious failures to protect and nurture and to provide medical assistance for their minor children. *Gibson v. Commonwealth*, 106 Ky. 360, 50 S.W. 532 (1899) (upholding manslaughter conviction of mother who abandoned her two-month old child on a neighbor's porch where the baby died from exposure); *Biddle v. Commonwealth*, 206 Va. 14, 141 S.E.2d 710 (1965) (collecting cases recognizing parents' criminal liability); John D. Perovich, *Homicide by Withholding Food, Clothing, or Shelter*, 61 A.L.R.3rd 1207 (updated weekly); *State v. Neumann*, 348 Wis.2d 455, 832 N.W.2d 560 (2013) (upholding reckless homicide conviction of parents who failed for religious reasons to provide medical attention to child); Baruch Gitlin, *Parents' Criminal Liability for Failure to Provide Medical Attention to Their Children*, 118 A.L.R.5TH 253 (updated weekly).

The Kentucky Penal Code, as noted, incorporates the parents' common law duties and has extended them. In *Bartley v. Commonwealth*, 400 S.W.3d 714 (Ky. 2013), this Court held that the conjunction of a mother's common-law and statutory duties of nurture and support subjected

---

**3.** For example, KRS 530.050 and KRS 530.060 criminalize a legal custodian's failure to support or failure to shield from neglect, dependency, or delinquency his or her child. *See also West v. Commonwealth*, 935 S.W.2d 315 (Ky.App.1996) (upholding manslaughter conviction for breach of a brother's duty to care for his disabled sister, a duty arising in part at least from KRS 209.990 which criminalizes the abuse and neglect of dependent adults).

**4.** Although not at issue in this case, the common law also recognizes contractual and quasi-contractual agreements to provide care as potential sources of legal duties the breach of which can give rise to criminal liability. *People v. Wong*, 81 N.Y.2d 600, 601 N.Y.S.2d 440, 619 N.E.2d 377 (1993) (recognizing potential liability of contractual caretaker for failing to prevent or to seek aid for injury to child). *See generally* Graham Hughes, *Criminal Omissions*, 67 Yale L.J. 590 (1958); Otto Kirchheimer, *Criminal Omissions* 55 Harv. L.Rev. 615 (1942).

her to criminal liability for first-degree assault based on the injurious neglect of her disabled adult son. Similarly, in *Lane v. Commonwealth*, 956 S.W.2d at 874 (assault) and *Tharp v. Commonwealth*, 40 S.W.3d 356 (Ky.2000) (complicity to murder), this Court held that under Penal Code and other statutory provisions enacted for the protection of children, particularly the criminal abuse statutes, a parent's duty to protect his or her child from harm now includes the duty to protect the child from abuse by the parent's spouse or domestic companion. *See also, People v. Stanciel*, 153 Ill.2d 218, 180 Ill.Dec. 124, 606 N.E.2d 1201 (1992) (upholding the murder by complicity convictions of mothers who permitted their children to be killed by domestic partners).

The Commonwealth maintains that a similar conjunction of the common law and the Penal Code gives rise to a duty to protect on the part of someone, such as Staples, who cohabits with a parent and who assumes a substantially parent-like role with respect to that parent's child. The Penal Code provision the Commonwealth invokes is the criminal abuse statute, KRS 508.100, which, as noted above, provides in part (emphasis supplied) that a person is guilty of first-degree criminal abuse if he "permits another person [twelve years of age or less] *of whom he has actual custody* to be abused and thereby ... [c]auses [that person] serious physical injury." The General Assembly has not defined "actual custody," but in the Commonwealth's view the term embraces the relationship Staples had with Angel, and thus under the statute Staples had a duty not to permit Angel to be abused by anyone, including Garcia. The common law bears out this reading, the Commonwealth asserts, in its recognition that legal duties can arise from "special relationships," such as, the Commonwealth insists, the relationship a non-parent may, and in

this case did, establish with his cohabiting partner's child. Regardless of how the common law could be construed to apply in circumstances such as these, we have no doubt that under the criminal abuse statute Staples owed Angel a duty of protection.

■■■ The general rule under the common law is that a nonparent has no legal duty to support or care for his or her domestic partner's child. *People v. Myers*, 201 A.D.2d 855, 608 N.Y.S.2d 544, 545 (1994) ("A person who has no familial relationship to a child ordinarily has no legal duty to provide for it."). Even a stepfather, under the common law, generally "is under no legal obligation to support the child of his wife by a former husband." *Brummitt v. Commonwealth*, 357 S.W.2d 37, 39 (Ky.1962). See also, *Weinand v. Weinand*, 260 Neb. 146, 616 N.W.2d 1 (2000). The common law recognizes an exception to this general rule, however, for nonparents who stand *in loco parentis* (in the place of a parent) with respect to the child. *Brummitt*, 357 S.W.2d at 39. Such a relationship can be either temporary or permanent, and the law makes provision for that distinction.

■■■ Frequently, of course, parents must temporarily entrust the care of their children to others—school officials, relatives, baby-sitters, for example—and those persons, assuming only a limited responsibility for the child, can, but only to that limited extent, be subject to liability for injuries to the child. *See, e.g., Cashen v. Riney*, 239 Ky. 779, 40 S.W.2d 339 (1931) (holding that couple stood *in loco parentis* with respect to fourteen-year-old live-in housekeeper and so owed her a legal duty of protection against seduction by their son); *Oxley v. State*, 941 P.2d 520 (Okla. Crim.App.1997) (upholding child endangerment conviction of step-grandmother for

failing during an overnight visit to protect step-grandchild from sexual abuse by the child's grandfather). The temporary *in loco parentis* relationship and the limited duties arising from it end usually when the child returns to the parent's care. *Pratt v. Robinson,* 39 N.Y.2d 554, 384 N.Y.S.2d 749, 349 N.E.2d 849 (1976) (holding that school district and bus company owed no duty to child who was injured while walking home from bus stop). Almost by definition, therefore, the temporary *in loco parentis* relationship imposes no legal duty on the temporary caretaker to protect the child from abuse by a parent because the parent is not present when the child is in the caretaker's custody and control. *Cf. People v. Myers,* 608 N.Y.S.2d at 544 (holding that live-in boyfriend had no common-law legal duty toward his girlfriend's child and so could not be prosecuted for having failed to prevent his girlfriend from starving the child to death).

■ The common law also recognizes that some persons, often but not necessarily stepparents, can assume an *in loco parentis* relationship with someone else's child on a permanent, or at least indefinite basis. The law has traditionally recognized such a relationship only where the nonparent "has put himself in situation of lawful parent by assuming *all* the obligations incident to parental relationship and ... [has] actually discharge[d] those obligations" *Rutkowski v. Wasko,* 286 A.D. 327, 143 N.Y.S.2d 1 (1955) (emphasis in original); *Smith v. Smith,* 922 So.2d 94, 99 (Ala.2005) ("[A] nonparent stands *in loco parentis* if he or she (1) assumes the obligations incident to parental status, without legally adopting the child, and (2) voluntarily performs the parental duties to generally provide for the child."); *Simms v. United States,* 867 A.2d 200, 205 (D.C.2005) ("[T]he status of *in loco parentis* arises only when one is willing to assume *all* the

obligations and to receive *all* the benefits associated with one standing as a natural parent to a child.") (citation and internal quotation marks omitted).

A finding that one stood *in loco parentis* in this sense could, at one time at least, entitle one, for example, to a parent's tort immunity, *Rutkowski,* 143 N.Y.S.2d at 1; could give one an insurable interest in the child for life-insurance purposes, *First Colony Life Insurance Company v. Sanford,* 555 F.3d 177 (5th Cir.2009); could affect one's entitlement to bankruptcy allowances, *In re Ramsay,* 440 B.R. 85 (M.D.Penn.2010); could entitle the child to favorable inheritance tax treatment, *Conner v. Parsley,* 192 Ky. 827, 234 S.W. 972 (1921); could render one liable for the child's support and education, *Dixon v. Hosick,* 101 Ky. 231, 41 S.W. 282 (1897); and could give one standing to seek custody of or visitation with the child, *Simpson v. Simpson,* 586 S.W.2d 33 (Ky.1979) (abrogated by statute, as noted in *B.F. v. T.D.,* 194 S.W.3d 310 (2006)).

■ *In loco parentis* status could also render one liable for having failed to protect the child from injury, not only by a third person, *People v. Stephens,* 3 A.D.3d 57, 769 N.Y.S.2d 249 (2003) (upholding second-degree murder conviction of man who failed to seek medical aid for girlfriend's nine-year-old sister who was fatally injured while living with the couple), but also by the child's parent. *People v. Lilly,* 71 A.D.2d 393, 422 N.Y.S.2d 976 (1979) (explaining that nonparent standing *in loco parentis* has duty to aid child in face of mother's abuse, but reversing homicide conviction because the jury instructions misstated the requirements for a finding of *in loco parentis* status); *State v. Sherman,* 266 S.W.3d 395 (Tenn.2008) (recognizing potential liability (and so reinstating indictment) of nonparent standing *in loco paren-*

*tis* for failing to seek medical aid for child neglected by mother).

██ Under the common law, then, a nonparent can, either in the absence of the parent or, in narrow circumstances, in conjunction with or even opposed to the parent, have a legal duty to provide care, assistance, or protection to the parent's child. The *in loco parentis* cases do not apply here, however, because Staples is not alleged to have failed to protect Angel from an outside party while Angel was temporarily in his sole care, and neither is he alleged to have so fully assumed the role of parent to Angel as to stand permanently or indefinitely *in loco parentis* with respect to her and thus to have a common law legal duty to protect her from abuse by her mother.

If Staples had such a duty, therefore, it must have come from another source, and as noted above, the Commonwealth relies primarily on the criminal abuse statute as imposing the duty it says Staples violated by failing to protect Angel from Garcia. That statute, again, provides in pertinent part that a person is guilty of first-degree criminal abuse if he "permits another person [twelve years of age or less] *of whom he has actual custody* to be abused and thereby ... [c]auses [that person] serious physical injury." KRS 508.100 (emphasis supplied). We have not previously had much occasion to apply this portion of the statute or to consider the meaning of "actual custody" in this context, but in *Davis v. Commonwealth,* 967 S.W.2d 574 (Ky. 1998) we considered a similar case in which a live-in boyfriend was accused of having abused his girlfriend's child. The principal accusation was that the boyfriend (Davis) abused the child himself, but in response to the boyfriend's claim that a third party had inflicted the abuse at a

time when the girlfriend was not at home and he was caring for the child, the jury was instructed that it could still find the boyfriend guilty if it believed that he had permitted the third party's abuse. Upholding the abuse conviction based on the boyfriend allowing a third party to abuse the child, we addressed his contention that he did not have "actual custody" of his girlfriend's child as follows:

> "Actual custody" is not defined in the statute or in our common law. However, we do not believe the legislature intended to confine the criminal liability imposed by KRS 508.100 only to those having legal custody or guardianship of a child. While the legislature presumably did not intend to extend criminal liability to every person having temporary care or charge of a child, *we have no difficulty discerning an intent to include persons, such as Davis, who reside within the same household and stand in loco parentis to the child.*

967 S.W.2d at 581 (emphasis supplied). Latching on to the latter condition, Staples contends that other than legal custodians only those standing *in loco parentis* can be said to have "actual custody" of a child. The Commonwealth, on the other hand, emphasizing the other condition noted in *Davis,* argues that any adult residing in the same household with a child is an "actual custodian." *Davis,* of course, holds only that the conjunction of the two conditions was sufficient in that case to bring a nonparent within the ambit of "actual custody." We reject both parties' invitations to adopt *Davis's* extremes because while standing *in loco parentis* is not necessary, (otherwise the abuse statute would simply apply to "one standing *in loco parentis* ") neither is merely living in the same household sufficient.[5] However, we believe that

---

5. A mother (or father) and child may reside with others in any number of housing ar-

by using "actual custody" the General Assembly clearly intended the criminal abuse statutes to apply to persons, such as Staples, who reside with a child in a continuing parent-like role and who assume or share with the child's parent a substantial responsibility for such day-to-day necessities as food, shelter, and care of the child.

In construing KRS 508.100, we attempt, of course, to discern the General Assembly's intent, and we derive that intent, if at all possible, " 'from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration.' " *Hale v. Commonwealth*, 396 S.W.3d 841, 845 (Ky. 2013) (*quoting Maynes v. Commonwealth*, 361 S.W.3d 922, 924 (Ky.2012)). Here, although the General Assembly has not defined "actual custody," an actual custodian could be understood to include anyone who has "in fact" (actual) the "care and control" (custody) of a child. By its "plain" meaning, "actual custody" could thus include even brief, casual instances of tending to a child, but as we noted in *Davis*, it seems unlikely that the General Assembly meant "to extend criminal liability [for failure to protect] to every person having temporary care or charge of a child." 967 S.W.2d at 581.

If "actual custody" is meant then to have a more technical, legal meaning, a good place to begin understanding that meaning is to consider some of the terms the General Assembly did *not* choose. "Legal custody," "guardianship," "de facto custody," "standing *in loco parentis*" are all well-recognized terms with established meanings in the law that refer to a person's legal responsibility to and for a child. Had the General Assembly meant to limit the duty-to-act provisions of the criminal abuse statutes to persons in one or more of these already well-defined relationships it could and presumably would have made that intent clear by employing one or more of the established terms. Instead, the General Assembly deliberately employed a new term.[6] Its intent in choosing "actual custody," we believe, could only have been to bring within the duty-to-act provisions those persons whose relationship with a child, while perhaps not one of the aforementioned legal relationships, is nevertheless close and substantial enough to warrant society's expectation that he or she will not stand idly by and knowingly allow the child to be abused or killed.

We reject in particular Staples's contention that the duty-to-act provisions extend only to those with legal custody or to those who stand *in loco parentis*. The General

---

rangements where those other people have little or no involvement with the child or, perhaps, even the child's parent. A mere roommate, or even a person who is intimately involved with the child's parent but has no involvement in providing or caring for the child, is not someone who can be deemed to have actual custody of the child.

6. Other than the statutes embodying the three degrees of criminal abuse, the phrase "actual custody" only appears three other times in the Kentucky Revised Statutes. KRS 201.100, regarding the procedure for commitment of a juvenile, requires a writ of custody to be served on the child's parent or "the person having actual custody or control of the

child." KRS 388.230 pertains to the appointment of a guardian or conservator for a beneficiary of Veterans' Administration benefits and requires the petition to set forth the name of the person or institution "having actual custody of such beneficiary...." Both of these usages are entirely consistent with our construction of "actual custody." Finally, in a different context, KRS 532.120 pertaining to the calculation of terms of imprisonment uses "actual custody" to refer to the period of time an inmate is held by authorities following an escape but prior to return to the institution from which the escape occurred or another Department of Corrections institution.

Assembly has shown that it knows how to invoke *in loco parentis* if that is what it means, having used that precise term in other statutes. *See, e.g.,* KRS 156.730 (Interstate Compact on Educational Opportunities for Military Children, adopted in 2008) and KRS 286.5–381 (Savings Accounts of Minors, adopted in 1964). Rather, the legislature's choice of the novel term "actual custody" for the criminal abuse statutes was intended, precisely, we believe, to expand upon the very limited protection against abuse which the common law doctrine of *in loco parentis* accords children living in nontraditional families.

Such legislative intent to expand the protection of young children from adult perpetrators, even parental perpetrators, can also be discerned, we are convinced, in the fact that the criminal abuse statutes were given their current form in 1982, at a time when the reporting and prevention of child abuse were prominent national concerns. Douglas J. Besharov, *"Doing Something" About Child Abuse: The Need To Narrow The Grounds For State Intervention*, 8 Harv. J.L. & Pub. Pol'y, 539 (1985) (summarizing the history of child protection efforts in the United States and noting in particular the broad effect of the Child Abuse Prevention and Treatment Act of 1974, 42 U.S.C. §§ 5101–5106 (Supp. V 1975), on state legislation); Lois A. Weithorn, *Protecting Children From Exposure To Domestic Violence: The Use And Abuse Of Child Maltreatment*, 53 Hastings L.J. 1 (2001) (providing a slightly different account of the development of child protection laws in the United States). It is also consistent, at least, with the widely recognized fact that non-traditional families are far, far more common now than they were during the development of the common law, thus rendering a large and growing number of children dependent on the care of co-habiting nonparents.

Largely for this reason, we also reject Staples's contention that even if he might otherwise have had a statutory duty not to permit the abuse of Angel, that duty did not require him to prevent mistreatment by the child's mother. The criminal abuse statute of course makes no distinction between abuse by a parent and abuse by a nonparent. It says simply that an actual custodian is subject to liability if he permits the child to be abused and the child is injured as a result. The statute clearly contemplates that a nonparent can be an actual custodian, and so would seem just as clearly to contemplate that a nonparent can have a duty not to permit abuse by anyone, including the child's parent. Indeed, it seems highly unlikely that the General Assembly would impose upon "actual custodians" a duty not to permit the children in their care to be abused but then would except from that duty the most likely abusers [7]—an exception the General Assembly could easily have made express if that was its intent. We decline, therefore, to read an exception into the statute for allowing abuse at the hands of a parent.

This result comports with that reached by several other courts which have construed abuse statutes similar to ours as applying to nonparents who permit a parent's abuse: *Commonwealth v. Torres*, 442 Mass. 554, 813 N.E.2d 1261 (2004) (boyfriend liable for permitting mother's abuse); *State v. Widdison*, 4 P.3d 100

---

7. U.S. Department of Health and Human Services, Administration for Children and Families, Administration on Children, Youth and Families, Children's Bureau (2012) *Child Maltreatment 2011*. Available from *http://*

*www.acf.hhs.gov/proeyams/cb/research-data-technology/statistics-research/child-mal treatment* (indicating that parents are by far the most frequent abusers of children).

(Utah App.2000) (boyfriend liable for permitting mother's abuse); *People v. Carroll,* 93 N.Y.2d 564, 693 N.Y.S.2d 498, 715 N.E.2d 500 (1999) (stepmother liable for permitting father's abuse); *Commonwealth v. Brown,* 721 A.2d 1105 (Pa.Super.1998) (boyfriend liable for permitting mother's abuse); *Leet v. State,* 595 So.2d 959 (Fla.App.1991) (boyfriend liable for permitting mother's abuse).

In *Hawkins v. State,* 910 S.W.2d 176 (Tex.App.1995), which arose from an incident, witnessed by the defendant-boyfriend, in which a mother swung her seven-week-old son by the ankles and smashed his head against a piece of furniture, the court rejected the boyfriend's contention that he could not have had a duty to protect his girlfriend's child from the girlfriend's abuse because he had no authority to interfere with the girlfriend's exercise of her parental rights. The court noted that the abuse statute did not require the boyfriend to remove the child from the mother's custody, only to report the abuse if there was time to do so or, if possible, to interpose in some other way between the child and the mother's violence, such as by taking the child to another room.

In this case the dissent's view of the superiority of Garcia's "legal custody" and consequent diminishing, indeed elimination, of Staples's responsibility is seemingly tied to the significance of legal custody in the family law arena. Legal custody is of obvious significance in that context and the hierarchy established by identifying each individual's relationship to a child is controlling with respect to decision-making regarding the child's education, support, residence, and other matters. However, the Penal Code is not similarly focused; its focus is on criminal conduct and its consequences. In that regard, KRS 509.070 makes it a felony to interfere with another's lawful custody. But, significantly, KRS 503.110 states in relevant part that a parent is justified in using such force as the parent believes is "necessary to promote the welfare of a minor," provided, however, that the force used "is not designed to cause or known to create a substantial risk of causing death, serious physical injury, disfigurement, extreme pain, or extreme mental distress." Beyond that statutory recognition of a parent's right to reasonably discipline his or her child, parents have no superior authority or immunity when it comes to their conduct toward their child and its criminal consequences. Accordingly, it seems particularly inappropriate to suggest that the status of legal custodian overrides the duty which KRS 508.100 so clearly imposes on actual custodians in the face of abuse of a child (or mentally or physically helpless person) over whom they exercise some control. Parental rights, in other words, as fundamental as they assuredly are, do not include the legal right to abuse one's child and do not require a reading of KRS 508.100 at odds with its plain terms.

■■■ To reiterate, "actual custody" under the criminal abuse statutes includes a relationship between a nonparent and a child in which the nonparent resides indefinitely with the child in a parent-like role and assumes or shares a substantial responsibility for such necessities as food, shelter, and protection. The Commonwealth's allegations (and subsequent proof) that Staples and Garcia maintained a family-like relationship for several months, that Staples provided shelter for the child and other necessaries, and that, parent-like, Staples assumed a large portion of Angel's care were sufficient under the statute to establish that Staples was an "actual custodian" and so had a duty not to permit Angel to be abused, by her mother or by anyone else. As we explained in *Bartley*

*v. Commonwealth,* when the failure to perform a legal duty is an element of an offense—here Staples's duty as an "actual custodian" not to permit Angel to be abused-the existence of the duty—whether Staples's *alleged* relationship with the child made him an "actual custodian"—is a question of law addressed in the first instance to the trial court. If, as a matter of law, the allegations are sufficient, at trial the Commonwealth must prove, and the jury must find, that the alleged relationship giving rise to the duty in fact exists. Here, the jury did so by finding that Staples had actual custody of Angel. And, indeed, the Commonwealth's proof of its custodial allegations—evidence tending to show the length and nature of Staples's and Garcia's relationship and the degree of Staples's provision for and involvement with the child—was sufficient to permit a rational juror to find that the actual custody relationship in fact existed.[8] The trial court did not err, accordingly, either as a matter of law or in terms of evidentiary sufficiency, by including in the jury instructions theories for both first-degree manslaughter (complicity) and first-degree criminal abuse based on Staples's alleged breach of that duty.

### III. An Error During the Prosecutor's Closing Argument Did Not Undermine the Fairness of Staples's Trial.

In a related argument, Staples contends that even if the breach-of-duty instructions were proper, the prosecutor's discussion of them during closing argument so misstated the law as to render the trial fundamentally unfair. He objects in particular to a number of instances when

---

**8.** Had Staples requested that the instructions include a definition of "actual custody," then a remand as the dissent envisions, pursuant to *McClellan v. Commonwealth,* 715 S.W.2d 464 (Ky.1986), would likely be appropriate. Staples made no such instructional request, however, (he has not even made one on appeal) and providing him relief on our own motion is not appropriate. As we recently explained in *Martin v. Commonwealth,* 409 S.W.3d 340 (Ky.2013), RCr 9.54(2) "bars palpable error review for unpreserved claims that the trial court erred in the giving or the failure to give a specific instruction." 409 S.W.3d at 345. Even if the lack of an "actual custody" definition were thought of not as the omission of a separate instruction but as somehow rendering incomplete the instructions that were given, the purported error would be a ground for relief only if it were palpable. *Martin,* 409 S.W.3d at 346. The evidence of Staples's "actual custody" was compelling, and the jury's finding of "actual custody" cannot be said to have been manifestly unjust. The Supreme Court reached a similar conclusion in *Henderson v. Kibbe,* 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). In that case, a habeas petitioner claimed that the fairness of his trial was undermined by a jury instruction that failed adequately to elucidate one of the statutory elements of the crime. Noting the ample evidence supporting that element and the jury's consistent other findings, the Court concluded "that such an [amended] instruction would not have affected their verdict. Accordingly, we reject the suggestion that the omission of more complete instructions on the causation issue so infected the entire trial that the resulting conviction violated due process. Even if we were to make the unlikely assumption that the jury might have reached a different verdict pursuant to an additional instruction, that possibility is too speculative to justify the conclusion that constitutional error was committed." 431 U.S. at 156–57, 97 S.Ct. 1730. (internal quotation marks omitted). *See also Jones v. United States,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (noting that under the federal plain error rule, Fed. Rule Crim, Proc. 52(b), the proper standard for reviewing unpreserved claims of instructional error is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.") 527 U.S. at 390, 119 S.Ct. 2090 (citations and internal quotation marks omitted). Here, we are not persuaded that an instructional definition of "actual custody" is reasonably likely to have affected the verdict nor are we persuaded that there is a reasonable likelihood that the instruction given denied Staples due process.

the prosecutor stated or suggested that anyone residing in the same home with a child can be deemed an "actual custodian" of the child. At one point during his argument, for example, the prosecutor said to the jury, "Actual custody doesn't mean something that a court gives you custody of. Actual custody is someone living in your home. Someone that [is under] your oversight, . . . somebody just living there, that is actual custody." Staples acknowledges that he made no objection to these remarks, and he concedes that an unobjected-to prosecutorial error requires reversal only if it was "flagrant" or "palpable." *Hannah v. Commonwealth,* 306 S.W.3d 509 (Ky.2010) (discussing the test for flagrancy); *Brewer v. Commonwealth,* 206 S.W.3d 343 (Ky.2006) (discussing the test for palpable error). Under either test, the defendant will be entitled to relief only if the prosecutor's misconduct rendered the trial fundamentally unfair. Because that standard has not been met, we reject Staples's claim.

As noted above, we agree with Staples that under the criminal abuse statutes mere residence with a child does not render one an "actual custodian" of that child. It is entirely possible for an adult to reside with a child in whom he or she has no interest and for whom he or she provides no care. Agreeing with Staples that the prosecutor's contrary remarks were erroneous, therefore, we must ask if there is a substantial likelihood that without this error the result would have been different, *Hannah,* 306 S.W.3d at 509, *Brewer,* 206 S.W.3d at 343, or, if not, whether the prosecutor's misconduct was so jurisprudentially intolerable as to require reversal

even absent any prejudicial effect. *Martin v. Commonwealth,* 207 S.W.3d 1 (Ky. 2006).

The likelihood of prejudice, we are convinced, is not substantial. As we have discussed, there was ample evidence that Staples was far more involved in Angel's care and support than merely residing with her. As the jury heard, Staples himself acknowledged providing forty-percent of the child's care. The jury thus would almost certainly have found that a sufficiently involved relationship existed even had the prosecutor not understated what the "actual custody" relationship required.

Nor were the prosecutor's misstatements so flagrantly improper as to require relief for that reason alone. Indeed, at the time he made them, it was not clear that the prosecutor's remarks were improper at all, much less flagrantly so. As noted above, prior to Staples's trial neither this Court nor the Court of Appeals had determined that cohabitation with a child does not establish "actual custody," and Staples did not obtain a ruling to that effect from the trial court.[9] Although they were erroneous, therefore, the prosecutor's "mere residence" remarks were not flagrantly improper, as perhaps they would have been had they been deliberately contrary to settled law or the trial court's ruling on the issue (had there been one), and so do not entitle Staples to relief on that ground.

## IV. A Misstated Element Does Render The Complicity To Manslaughter Jury Instruction Palpably Erroneous.

▪ Staples also challenges the complicity portion of the first-degree man-

---

**9.** Again, in *Davis,* this Court merely stated, "we have no difficulty discerning an intent to include [as an actual custodian] persons, such as Davis, who reside within the same household and stand *in loco parentis* to the child." 967 S.W.2d at 581. Stating that Davis, who

exhibited those two factors, was included as an actual custodian under the criminal abuse statute in no way precluded others who exhibit different factors of actual custody from also being including within the statute.

slaughter jury instruction on a different ground. That instruction provided in relevant part:

You will find the Defendant guilty of First–Degree Manslaughter under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. (1) That in this county on or about December 1, 2009, and before the finding of this Indictment herein, he killed Angel Tucker by blunt force trauma;

AND

(2) That in so doing, he did not intend to kill Angel Tucker but intended to cause serious physical injury to Angel Tucker.

OR

B. (1) That in this county on or about December 1, 2009, and before the finding of the Indictment herein, Brittany Garcia killed Angel Tucker by blunt force trauma;

(2) That in so doing, Brittany Garcia did not intend to kill Angel Tucker but intended to cause serious physical injury to Angel Tucker;

(3) That the Defendant had actual custody of Angel Tucker;

AND

(4) That at the time of Angel Tucker's death, the Defendant was acting wantonly or recklessly with respect to the risk that Brittany Garcia would inflict death or injury upon Angel Tucker and failed to make an effort reasonable under the circumstances to protect Angel Tucker from such harm.

C. If you believe from the evidence beyond a reasonable doubt that the Defendant is guilty under this Instruction, but you are unable to determine from the evidence whether the Defendant committed First–Degree Manslaughter as Principal under Section A or Accomplice under Second B, then you will find him guilty of First–Degree Manslaughter, Principal or Accomplice, and so state in your verdict.

The instruction thus allowed the jury to convict Staples under subpart (A) as a principal, under subpart (B) as an accomplice, or under subpart (C) as either a principal *or* accomplice. The jury convicted under (C), principal or accomplice, rendering Staples's manslaughter conviction reversible if the complicity instruction was palpably erroneous.

We addressed Staples's challenge to B(3)—his contention that he had no custodial status and no legal duty to protect Angel from harm—above. Staples now objects to B(4) and contends that inasmuch as the *mens rea* required for first-degree manslaughter is intent—the intent to cause serious physical injury—the instruction misstated the law by permitting the jury to find him guilty of that offense on the basis of a mental state—wantonness or recklessness—less culpable than the statutory requirement. Staples did not raise this objection before the trial court, as required by RCr 9.54,[10] and thus our re-

10. Staples did not tender proposed instructions, and during the instructions colloquy at trial, his only objection to the first-degree manslaughter instruction was to its final paragraph, which advised the jury that if it believed Staples guilty, but could not determine in what capacity, it should "find him guilty of First Degree Manslaughter, Principal or Accomplice, and so state in your verdict." Staples made no objection to the complicity portion of the instruction. He contends that his remarking during the colloquy that he had no objection to the *mens rea* requirement (intent) of the principal portion of the first-degree manslaughter instruction, and his objecting to the complicity portion of the reckless homi-

view is governed by RCr 10.26, the substantial error rule. We agree with Staples that the instruction, while largely taken from *Kentucky Instructions to Juries (Criminal)*, was an erroneous statement of the law and resulted in a manifest injustice.

■ As noted above, the complicity theory of the Commonwealth's case against Staples was based on KRS 502.020(2)(c), which provides in pertinent part that "[w]hen causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he: ... [h]aving a legal duty to prevent the conduct causing the result, fails to make a proper effort to do so." Under this statute, the wrongful result—the *actus reas*—brought about by the principal—in this case the wrongful death of Angel—is imputed to the duty-breaching complicitor, but the degree or grade of the complicitor's offense is determined by the complicitor's own *mens rea*. As we explained in *Hudson v. Commonwealth*, 385 S.W.3d 411 (Ky.2012),

> [t]o be guilty as an accomplice under KRS 502.020(2), a person must act with respect to that result [here the wrongful death] with the "kind of culpability," meaning the *mens rea*, required for the offense charged, *i.e.*, intent, wantonness, recklessness. For example, to be guilty of intentional murder as an accomplice to the act, the defendant must have intended for the victim to be killed. Conversely, in a situation where the defendant *did not* intend that the victim be killed, he may only be convicted of the homicide offense that corresponds with

his own *mens rea*, such as wantonness, recklessness, or intent to cause serious physical injury, but not death.

385 S.W.3d at 415 (*citing Harper v. Commonwealth*, 43 S.W.3d 261 (Ky.2001) and *Tharp v. Commonwealth*, 40 S.W.3d at 356).

Under the complicity portion of the homicide instructions in this case, however, including the first-degree manslaughter instruction pursuant to which Staples was convicted, the jury was directed to fix the grade of the offense not with reference to the accomplice's own *mens rea*, but rather with reference to the principal's *mens rea*, the principal's culpability being imputed to the accomplice under the instruction if the accomplice acted (or failed to act) "wantonly or recklessly." As Staples correctly notes, under KRS 502.020(2), the principal's *mens rea* is largely irrelevant, *Tharp*, 40 S.W.3d at 365 (explaining that "[t]he principal actor's mental state ... is largely immaterial to the criminal liability of an accomplice"), and so the first-degree manslaughter instruction should not have imputed Garcia's *mens rea* to Staples, but rather should have required the jury to find that Staples's own *mens rea* was "the kind of culpability" required for that offense, *i.e.*, that in breaching his duty to protect Angel he had acted (or failed to act) with the intent that Garcia seriously injure, but not kill, the child.

■ When the error is properly preserved, a jury instruction that omits or misstates an element of the offense gives rise to a strong presumption of prejudice and requires reversal unless the Commonwealth can establish that the error was harmless beyond a reasonable doubt.

---

cide instruction somehow add up to the objection he is raising now, but those oblique comments do not satisfy RCr 9.54's requirement that an objecting party "stat[e] specifically the matter to which the party objects and the ground or grounds of the objection." This issue is plainly unpreserved.

*Harper v. Commonwealth,* 43 S.W.3d at 261, *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). Unpreserved, however, such an error is subject to RCr 10.26, and is thus reversible only if the defendant can establish that the error was palpable, *i.e.,* clearly contrary to existing law; was substantial, *i.e.,* that it probably (not just possibly) affected the result or denied the defendant due process; and was sufficiently egregious that leaving it uncorrected would constitute a manifest injustice, thus justifying the appellate court's discretionary invasion of a trial court decision to which the defendant acquiesced. *Martin v. Commonwealth,* 207 S.W.3d at 1 (discussing the palpable error standard); *but see Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (applying the plain error rule to an omitted-element instructional error and holding that the error did not rise to the plain error standard). Under RCr 10.26, we have reversed where erroneous jury instructions expressly directed the jury to base persistent-felony-offender findings on ineligible prior offenses, *Sanders v. Commonwealth,* 301 S.W.3d 497 (Ky.2010); *Carver v. Commonwealth,* 303 S.W.3d 110 (Ky.2010), but we have declined to reverse where, although an element was omitted from the instructions or was misstated, the element was not contested, *Tharp v. Commonwealth,* (fact that defendant was victim's mother not contested), or was sufficiently established by the evidence as to make any prejudice very unlikely and otherwise to allay any concern about "manifest injustice." *Owens v. Commonwealth,* 329 S.W.3d 307 (Ky.2011) (tampering with evidence instruction failed to specify what evidence had been tampered with, but proof at trial included ample evidence of specific instances of tampering).

The Commonwealth contends that the challenged first-degree manslaughter instruction was not erroneous, or if erroneous was not palpably so, because it was modeled upon section 10.16 of 1 Cooper, *Kentucky Instructions to Juries (Criminal):*

### Complicity to Murder

You will find the Defendant guilty of Complicity to Murder under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about _____ (date) and before the finding of the Indictment herein, _____ (D–2) killed _____ (victim) by _____ (method);

B. That in so doing, _____ (D–2) caused the death of _____ (victim) intentionally;

C. That the Defendant was [the mother] of _____ (victim);

AND

D. That at the time of _____ (victim)'s death, the Defendant was acting wantonly or recklessly with respect to the risk that _____ (D–2) would inflict death or injury upon _____ (victim) and failed to make an effort reasonable under the circumstances to protect _____ (victim) from such harm.

As the Commonwealth notes, like the homicide instructions in this case this model instruction purports to impute the principal's *mens rea* to the accomplice if the accomplice was acting "wantonly or recklessly." As immensely valuable and as usually sound as the model instructions are, they are not, as the Commonwealth concedes, official (although many of them have been officially sanctioned through our cases), and they do not absolve the trial court and counsel of their responsibility to ensure that the instructions given the jury

accurately reflect the law. For the reasons discussed above, this model instruction does *not* accurately reflect the law of accomplice liability based on breach of a legal duty, and thus the trial court's reliance on it was erroneous.[11]

One might argue that even under the erroneous instruction the jury at the very least found that Staples was recklessly complicit in Angel's killing. Under that logic, we would remand the matter to the trial court with instructions to modify the Judgment to reflect a conviction for reckless homicide. Neither party has requested such a remand, however, so the question is not properly before us. And even if it were, it is by no means clear that such a remand would be appropriate. Although there is a split of authority, it appears that most courts limit such remands to cases in which the jury was properly instructed on the lesser offense that is to be substituted for the invalid greater offense. *See State v. Sanseverino*, 291 Conn. 574, 969 A.2d 710 (2009) (collecting cases discussing when such modifications are appropriate); *United States v. Dhinsa* 243 F.3d 635 (2nd Cir.2001) (same). Here, however, all of the complicity to homicide instructions, including the instruction for complicity to reckless homicide, incorporated the same error: they all invited the jury to find Staples guilty of Garcia's crime if he was "wanton or reckless." There is no such crime as "wanton or reckless" homicide. Under these ambiguous instructions, it would not be clear that the jury believed Staples's conduct was only reckless because some may have deemed it wanton. The ambiguity taints the reckless homicide instruction as much as the others, and there is no reason to conclude that Staples should be given the benefit of the ambiguity by having his conviction on remand limited to the lesser offense, reckless homicide.

In sum, the first-degree manslaughter complicity instruction was clearly erroneous under existing law, and unlike the missing elements in *Tharp* and *Owens*, the instructional error here relates to a fundamental point, the very *mens rea* required to convict. The evidence that Angel had repeatedly been subjected to intentional injuries, including the injury that killed her, was overwhelming, but to sustain a complicity conviction as to Staples the jury must have been instructed that he acted intentionally with respect to the breach of his duty and with respect to the serious physical injury inflicted by Garcia. For this reason, we must reverse the manslaughter conviction and remand for further proceedings. On remand, a proper combination first-degree manslaughter instruction would include a principal instruc-

11. Somewhat ironically, as Staples points out, there is an alternative model instruction for "Complicity, as to Result; Legal Duty to Protect," which more accurately requires the jury to base its culpability finding on the accomplice's own *mens rea*. 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 10.15 (5th ed.2012). According to the Comment accompanying the model instruction the trial court employed, the instruction was based on a remark in a two-Justice concurring opinion by Justice Cooper in *Lane v. Commonwealth*, 956 S.W.2d 874 (Ky.1997), to the effect that if "a parent acts wantonly or recklessly with respect to a risk that harm will occur to the child and fails to make a reasonable effort to prevent it, he is guilty of complicity under KRS 502.020(2)." *Id.* at 882. Justice Cooper himself undermined whatever authority his remark in *Lane* lent to the model instruction when, writing for the Court in *Tharp v. Commonwealth*, 40 S.W.3d 356 (Ky.2000), he took pains to explain that the degree of a complicitor's culpability for a result crime is a matter of his own, not the principal's, *mens rea*. The Lane-based model instruction upon which the trial court relied is thus a rare instance where a model instruction was superseded by subsequent case law, but unfortunately was not removed from the book.

tion as quoted above and an accomplice instruction based on legal duty as follows:

B. (1) That in this county on or about December 1, 2009, and before the finding of the Indictment herein, Brittany Garcia killed Angel Tucker by blunt force trauma;

(2) That Defendant (Staples) shared actual custody of Angel Tucker;

(3) That at the time Angel Tucker was killed, Defendant (Staples) intentionally breached his legal duty to protect Angel Tucker by failing to prevent Brittany Garcia's use of the blunt force which killed Angel Tucker;

(4) That, regardless of whether Defendant (Staples) intended for Angel to be killed, he at least intended that Brittany Garcia seriously physically injure her; and

(5) That Defendant (Staples) was physically capable of performing his duty to protect Angel Tucker from serious physical injury.

## V. The Trial Court Did Not Abuse Its Discretion By Admitting Autopsy Photographs Into Evidence.

 Staples next challenges a couple of decisions by the trial court to admit evidence over his, Staples's, objection. Prior to the medical examiner's testimony, Staples objected on relevancy grounds to the introduction of autopsy photographs made during the examination of Angel's body. During the lead detective's testimony, Staples objected on Confrontation Clause grounds to the introduction of statements Garcia made to the detective during his investigation. The trial court excluded one of the autopsy photographs as duplicative, but otherwise it summarily overruled both objections. We consider first Staples's contention that the prejudicial effect of what he characterizes as the gruesome autopsy photographs substantially outweighed their probative value, and thus that the photographs should have been excluded under KRE 403. We review this ordinary sort of evidentiary ruling for abuse of discretion. *Walker v. Commonwealth,* 288 S.W.3d 729 (Ky.2009).

 As Staples notes, we have disapproved of the use at trial of photos depicting badly decomposed or mutilated bodies the condition of which no longer accurately reflects the results of the crime. *Funk v. Commonwealth,* 842 S.W.2d 476 (Ky.1992) (decomposition and mutilation by animals); *Clark v. Commonwealth,* 833 S.W.2d 793 (Ky.1992) (decomposition). The general rule, however, has long been that "a photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous." *Funk,* 842 S.W.2d at 479 (*citing Salisbury v. Commonwealth,* 417 S.W.2d 244 (Ky. 1967)).

Under this rule, we have many times upheld the Commonwealth's use of autopsy photographs introduced in conjunction with a medical examiner's testimony concerning the cause and manner of a homicide victim's injuries and death. *See, e.g., Brown v. Commonwealth,* 313 S.W.3d 577 (Ky.2010); *Hunt v. Commonwealth,* 304 S.W.3d 15 (Ky.2009); *Dant v. Commonwealth,* 258 S.W.3d 12 (Ky.2008); *Quarels v. Commonwealth,* 142 S.W.3d 73 (Ky. 2004); *Young v. Commonwealth,* 50 S.W.3d 148 (Ky.2001); *Davis v. Commonwealth,* 967 S.W.2d at 574. Although disturbing, as by their nature autopsy photographs tend to be, the five photographs admitted here were no more than were reasonably necessary to provide illustration for the medical examiner's testimony and to support her findings. They were relevant as tending to show not only that the child had been fatally injured, but also that the fatal head injury was of a severity

almost certain to have been inflicted and not likely to have happened accidentally.

This is true as well of the photo depicting the exposed spinal cord, to which Staples takes particular exception. The medical examiner used that picture, which showed blood around the top of the cord, as part of her demonstration that, underneath the seemingly not so severe surface bruise on the side of the child's head, there had been massive bleeding, bleeding enough to collect around the spinal cord. Such an injury, according to the examiner, could only have resulted from a very severe, and very likely inflicted, blunt force impact. The probative value of the autopsy photographs, including the one of the spinal cord, was thus substantial and was not outweighed by the photos' graphic nature.

Staples's contrary contention that the photos did not reflect the condition of the body as a result of the crime is without merit. Staples notes that several of the child's organs were removed prior to the autopsy, but in none of the photos introduced at trial is that fact apparent, and otherwise the pictures of the child's injuries, including the picture of blood around the top of the spinal cord are relevant precisely because they *do* reflect the condition of the body as a result of the crime. *Ratliff v. Commonwealth,* 194 S.W.3d 258 (Ky.2006) (recognizing that autopsy to reveal internal injury is not an impermissible alteration of the body's condition). The trial court, therefore, did not abuse its discretion under KRE 403 by admitting the photographs.

## VI. Although Erroneous, the Introduction of Portions of Garcia's Statement to the Investigating Detective Was Harmless Beyond a Reasonable Doubt.

■ Staples also objected to the introduction during the lead detective's testimony of portions of an audio recording the detective made during his interview of Garcia. The trial court overruled the objection, and the jury heard Garcia tell the detective that she and Staples argued a lot, that during the period leading to Angel's death Staples had not been employed and so had spent his days at home with her and Angel, and that during the few days immediately before Angel's death nobody but she and Staples had had care of the child. The Commonwealth concedes that the introduction of Garcia's clearly testimonial hearsay statements regarding Staples violated Staples's Sixth Amendment right to confront and to cross-examine the witnesses against him. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). It maintains, however, that the error in this case was harmless beyond a reasonable doubt and so does not entitle Staples to relief. We agree.

■ *Crawford* error, as indicated, is subject to harmless error analysis. *Heard v. Commonwealth,* 217 S.W.3d 240 (Ky. 2007) (analyzing *Crawford* error for harmlessness); *Bullcoming v. New Mexico,* — U.S. —, 131 S.Ct. 2705, 2719, 180 L.Ed.2d 610 nt. 11 (2011) (reversing on the ground of *Crawford* error, but noting that "nothing in this opinion impedes a harmless-error inquiry on remand"); *State v. Vigil,* 306 P.3d 845 (Utah App.2013) (collecting cases to show that every federal circuit has applied harmless error analysis to *Crawford* errors). Harmless error analysis applied to a constitutional error, such as the Confrontation Clause violation addressed in *Crawford,* involves considering the improper evidence in the context of the entire trial and asking whether there is a " 'reasonable possibility that the evidence complained of might have contributed to

the conviction.'" *Talbott v. Commonwealth*, 968 S.W.2d 76, 84 (Ky.1998) (quoting from *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). A properly preserved constitutional error is reversible, in other words, unless it was "harmless beyond a reasonable doubt." *Id.* (again citing *Chapman* ). The question is not simply whether there was sufficient evidence to support the conviction aside from the improper evidence. The question, rather, is whether the improper evidence was of a weight, was of a striking enough nature, or played a prominent enough role in the Commonwealth's case to raise a reasonable possibility that it contributed to the conviction.

In *Turner v. Commonwealth*, 248 S.W.3d 543 (Ky.2008), for example, we deemed harmless the admission of a tape-recorded remark by an informant who did not testify at trial, but who had, allegedly, participated in a drug transaction with the defendant. The remark was to' the effect that the defendant possessed a certain drug. The Commonwealth introduced the recording not as evidence of what the informant said, but rather as evidence of what the defendant said and of the fact that a transaction occurred. Quite apart from the informant's remark, the defendant's own statements together with other evidence clearly established the defendant's possession of the drug. Given its insignificant role in the Commonwealth's case and its cumulativeness, we had no trouble concluding, unanimously, that the informant's remark was harmless beyond a reasonable doubt.

Other courts, looking at such factors as how inculpatory the evidence was, how it was presented, the role it played in the state's case, whether it was cumulative and in particular cumulative of evidence supplied by the defendant him or herself, and the overall strength of the prosecution,

have likewise deemed harmless certain instances of improperly admitted investigatory hearsay. *Hawes v. State*, 826 N.W.2d 775 (Minn.2013); *Jackson v. State*, 291 Ga. 22, 727 S.E.2d 106 (2012).

In *Heard v. Commonwealth*, 217 S.W.3d at 240, on the other hand, we held that a *Crawford* violation was not harmless where the improper evidence was the only evidence on several points and was "the most damning [evidence] against Appellant with regard to the second-degree assault conviction." 217 S.W.3d at 245. For similar reasons we also rejected a harmless error claim in *Barth v. Commonwealth*, 80 S.W.3d 390 (Ky.2001).

Unlike the damning evidence in *Heard* and *Barth*, Garcia's out-of-court statements to the effect that during her time with Staples, Staples was not working, was regularly at home, and along with Garcia provided virtually all of Angel's care, were not directly inculpatory and were all cumulative of similar observations testified to by other witnesses. In particular they were cumulative of the statements Staples himself made to the social worker and the detective who investigated. The jury heard Staples tell the detective that he, Garcia, and Angel had all lived together since Angel was two-months-old; and the social worker testified that Staples told her that he and Garcia shared responsibility for Angel and that he contributed forty-percent of the child's care. He even claimed to have taught Garcia how to bathe the child. The evidence made abundantly clear that on occasion friends and relatives helped to mind the child, but aside from closing arguments along the lines of, "Who knows?" neither Staples nor Garcia ever blamed or suggested any reason for blaming any of those other people for harming Angel. Staples's mother testified that as late as 7:00 or 8:00 pm the evening prior to Angel's final collapse the

child was fine and was in Staples's and Garcia's sole care. Staples and Garcia themselves confirmed that testimony. Indeed, so uncontested were the facts that Staples was regularly with the child and provided a large portion of her care, that the trial court was persuaded to admit Garcia's statements on the ground that they were not inculpatory at all but merely provided background evidence. Although we would not agree with that assessment, for it is clear enough that Garcia's statements, by confirming the fact that Staples had opportunities to harm the child, had some tendency to inculpate him, nevertheless, Garcia's statements added so little to the other, overwhelming evidence establishing that same fact (including especially the evidence from Staples himself) that on that point at least they were harmless beyond a reasonable doubt.

The fact that Garcia and Staples argued a lot was also noted by several other witnesses, and importantly it did not figure at all in the Commonwealth's theory of the case or in the Commonwealth's closing argument. Garcia's counsel did refer to it in closing, but did so without mentioning Garcia's statement in particular and only in the course of speculating that bad blood may have developed between Staples and James Tucker, Angel's father. That speculation, however, was based primarily on Tucker's testimony concerning Garcia's stay with him over Thanksgiving, and there is no reasonable possibility that anything the jury may have made of that speculation would not have been the same even without Garcia's generic remark about arguing. Staples is correct, in other words, that the admission of Garcia's statements about him violated the Sixth Amendment as construed by the Supreme Court in *Crawford*, but because the violation was harmless beyond a reasonable doubt, it does not entitle him to relief.

## VII. Staples Waived His Right To An Additional Juror Strike.

Finally, Staples contends that he is entitled to a new trial because the trial court allotted to him only one peremptory juror strike to be exercised independently instead of the two independent strikes called for by RCr 9.40. The Commonwealth maintains that Staples waived his right to the additional strike by acquiescing in the trial court's apparent misconstruction of the rule. After careful review of the trial court's exchange with the Commonwealth and defense counsel, we believe the Commonwealth's view is consistent with both the facts of record and the law.

As this Court explained in *Springer v. Commonwealth*, 998 S.W.2d 439 (Ky.1999), under RCr 9.40, in a joint criminal trial such as this one the defendants are entitled to nine (instead of the usual eight) peremptory juror strikes to be exercised jointly, and to an additional strike each, to be exercised independently. If one or two alternate jurors are to be selected, then each defendant is entitled to a second independent strike. Alternate jurors were selected in this case, and it is this second independent strike that Staples claims he was denied.

Prior to *voir dire*, the parties called the court's attention to the need for additional strikes in a joint trial, and during a general discussion Staples's counsel mentioned RCr 9.40, *Springer*, and the fact that a second independent strike is allowed if one or two alternate jurors is or are selected. After a brief review of the law with counsel present at the bench, the court ruled that each defendant would have one independent strike, and that the defendants would have nine strikes to exercise jointly—the proper allotment in a joint trial if no alternate juror was to be selected, yet the court made clear that there would be

two alternate jurors seated.[12] Nevertheless, neither defendant objected to the court's ruling on this ground,[13] either then or at any other point prior to the actual seating of the jury. Rather, although obviously aware of the right to an additional independent strike, Staples's counsel stood mute as the trial court made its ruling, and thereby in effect declared himself satisfied with the court's allotment.

■ In *Springer*, as Staples notes, we reiterated that the right to peremptory juror strikes is a "substantial" one, and we reversed the conviction in that case for an error similar to the one here without regard for the harmless error rule. *Id.* at 445. In *Mills v. Commonwealth*, 95 S.W.3d 838 (Ky.2003), however, we denied relief for an even more pronounced error—the trial court had allotted neither of the independent strikes to which the defendant was entitled—because the defendant had failed to preserve his claim by lodging an appropriate objection. "If the issue is properly preserved by the adversely affected litigant," we held, then "an improper allocation of peremptory challenges is reversible error." 95 S.W.3d at 843 (citations and internal quotation marks omitted). The Court declined Mills's request for review under RCr 10.26 and thereby indicated that, generally at least, the failure to object to a misallocation of juror strikes will be deemed a waiver of the right. Here, while Staples's counsel initially referenced the applicable law during a general pretrial discussion, he stood silently and never objected when the trial judge, having consulted a reference book, announced his ruling. Subsequently, *voir dire* began and was concluded without any

objection that Staples was being denied a second independent peremptory strike to which he was entitled. The trial court's deviation from the requirements of RCr 9.40 without objection, therefore, does not entitle Staples to relief.

### CONCLUSION

Having found error in the trial court's misstatement of the law in the jury instruction on complicity to first-degree manslaughter, we reverse that conviction and remand for further proceedings. We affirm the remainder of the Butler Circuit Court's judgment convicting Staples of first-degree criminal abuse and sentencing him as a second-degree persistent felony offender.

MINTON, C.J.; CUNNINGHAM, KELLER, and SCOTT, JJ., concur. NOBLE, J., concurs in part and dissents in part by separate opinion in which VENTERS, J., joins. VENTERS, J., concurs in part and dissents in part by separate opinion in which NOBLE, J., joins.

NOBLE, J., Concurring in part and Dissenting in part.

While I agree with the majority that Nickolas Staples' conviction for manslaughter must be reversed, I do so for an additional reason, namely, because he cannot be criminally liable under a theory that he had "actual custody" of his girlfriend's child when the girlfriend was present. I also believe his conviction for criminal abuse is tainted for the same reason.

The majority concludes that the jury instructions in this case were correct to the extent that they allowed the jury to

---

12. The end result was the Commonwealth had nine strikes and the defendants shared nine strikes, with Garcia and Staples each having one independent strike, for a total of twenty strikes.

13. The only objection was Garcia's renewal of a previously denied claim for nine independent strikes.

conclude that Staples had "actual custody" of the child victim under the criminal-abuse statutes, KRS 508.100–. 120. Liability for criminal abuse arises when a person "permits another person of whom he has actual custody to be abused," *id.*, which, according to the majority, would allow Staples' conviction for criminal abuse. This in turn, according to the majority, gives rise to a legal duty (to prevent criminal abuse) sufficient to allow Staples' conviction for complicity to first-degree manslaughter.[14] The majority reads "actual custody" "to apply to persons, such as Staples, who reside with a child in a continuing parent-like role and who assume or share with the child's parent a substantial responsibility for such day-to-day necessities as food, shelter, and care of the child." *Ante* at 815.

I could not disagree more.

In reaching its conclusion, the majority relies on the General Assembly's choice of an unusual term—"actual custody"—instead of traditional legal terms, such as "custody," "legal custody," or "standing *in loco parentis*" to avoid the plain meaning of the phrase and instead arrive at a "technical, legal meaning." *Ante* at 816. The majority also relies heavily on the fact that the abuse statutes were passed "at a time when the reporting and prevention of child abuse were prominent national concerns." *Ante* at 816. From these, the majority concludes that the General Assembly intended "actual custody" to extend criminal liability beyond persons in "traditional" families to include those living in non-

traditional families—even where the person's relationship with the child is akin to that of a live-in babysitter and the abuse is committed by the child's *parent*.

But the majority fails to explain why it must move beyond the plain meaning of the phrase, which it admits is something like "anyone who has 'in fact' (actual) the 'care and control' (custody) of a child." *Ante* at 815. When interpreting statutes, "our goal is to give effect to the intent of the General Assembly." *Maynes v. Commonwealth*, 361 S.W.3d 922, 924 (Ky.2012). We are to "derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration." *Id.* And "[o]nly if the statute is ambiguous or otherwise frustrates a plain reading, do we resort to extrinsic aids such as the statute's legislative history or the canons of construction." *Id.* The plain meaning of the phrase "actual custody" is not difficult to discern—it means a person in fact having care and control of a child—and thus there is no need to resort to examining linguistic alternatives not chosen by the General Assembly[15] or a sociological history of the time when the statute was passed. It is very possible—indeed, easy for once—to derive the legislative intent from the language used here.

The term "actual custody" is intended to apply to persons who have been given care and control of a child. Obvious examples include teachers, relatives, and babysitters into whose care a child is entrusted while a

14. Under KRS 502.020, a person is guilty of an offense committed by another person when "he … [h]aving a legal duty to prevent the commission of the offense, fails to make a proper effort to do so."

15. No doubt, the majority would argue that this plain meaning sounds suspiciously like standing *in loco parentis,* and thus the choice

not to employ the Latin phrase is meaningful and requires us to look beyond plain meaning. But the General Assembly's choice is more readily explained by the requirement that statutes "be written in nontechnical language and in a clear and coherent manner using words with common and everyday meanings." KRS 446.015.

parent is away. Thus, the defendant in *Davis v. Commonwealth*, 967 S.W.2d 574 (Ky.1998), was properly convicted, because the child had been temporarily left in his care while the mother was absent and he had allowed another child to hit the victim in the face while under his care.

When the parent is present, however, a non-parent like Staples cannot have actual custody. The proof in this case shows that either Staples or the child's mother, Brittany Garcia, caused the injuries. But if the child's mother caused the injuries, then she was necessarily present and had assumed the full mantle of custody of the child, along with all concomitant duties and rights, chief amongst which is a constitutionally protected "interest . . . in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). In such an instance, the mother's legal custody—and status as an actual parent—necessarily displaced any temporary custody that Staples might otherwise have had. Staples may have had "actual custody" when he was caring for the child in the mother's absence, as the defendant in *Davis* did, but once the mother returned, she took up actual custody of the child.

The majority attempts to dismiss the significance of the mother's status as legal custodian, claiming that the Penal Code is focused only "on criminal conduct and its consequences." *Ante* at 818. This ignores the fact that the legal consequences of a mother's status as a child's biological mother and legal custodian do not evaporate in the face of the criminal law. Such consequences persist and control the rights and obligations of people absent a superseding right or obligation. A parent's right to the care, custody, and control of her child is legally (though maybe not morally) superior to that of a non-parent with no legal tie or claim on the child.

Nothing in KRS 508.100 changes that hierarchy.

That Staples had actual custody of the child when she was left in his care during the mother's absence does not change this when the mother is present. And while Staples could have some delegated right to discipline and care for the child when the mother was present, if she gave him such permission, there is no question that his right was subsidiary and inferior to the mother's and could be superseded by her at will. Indeed, the flaw in the majority's understanding of "actual custody," and its alleged independence from the notion of legal custody, is illustrated by the fact that the source of Staples' authority over the child is the child's mother. Without her delegation of authority to him, he had no authority, and thus could not legally control or discipline the child. Thus, Staples' supposed actual custody of the child is inextricably linked to the mother's legal status as the child's biological mother and legal custodian with the power to disallow Staples *any* authority over the child.

When the mother was present, Staples' authority was bound by what she permitted him to do with the child, and she had full legal authority to tell him to stop any action he might be taking toward the child. He had no such authority in return. For him to *actually have custody* of the child, she had to vacate the scene and leave him as the sole or at least highest authority over the child. When she was present, he simply was not the highest authority over the child. She was.

I agree with the majority to the extent that the use of the phrase "actual custody" was intended to expand the scope of liability for criminal abuse beyond a parent to include babysitters, day-care workers, and other situations where (and when) a non-parent is entrusted with full control of the child. But I cannot concur that the phrase

was meant to capture every person living with the actual parent and child and having substantial child-care responsibilities.

That this leads to an extreme position—especially in light of increasingly common non-traditional living arrangements—should be obvious. The majority's view of the statute would extend criminal liability—for both abuse and complicity to homicide—to an elderly mother who lives with a daughter and engages in frequent care of the daughter's child, if the daughter abuses the child. The same could be said for a parent's sister, or cousin, or an older daughter—if they at any time substantially assist in parenting. And the list doesn't stop there. What about a mere roommate? Or a boarder who pays rent by providing child care and groceries? Or a live-in nanny who, in many circumstances, might have a closer relationship with the child than its parents? The majority's reading of the statute does not apply only to live-in boyfriends and girlfriends. Surely the General Assembly did not intend the statute to have such reach. Indeed, we have already said that the "legislature presumably did not intend to extend criminal liability to every person having temporary care or charge of a child." *Davis*, 967 S.W.2d at 581. Yet that is arguably exactly what the majority's reading does, as long as the child care is a "substantial responsibility."

Of course, the majority adds the qualifier that the defendant must also have "a continuing parent-like role." But this applies to all the categories listed above. And if the legislature intended "actual custody" to apply only to live-in boy- or girlfriends filling the slot of the other parent, it would have said so. But anyone with enough responsibility for the care of a child could be viewed as having a "parent-like role" in the child's life and thus would be subject to criminal liability for failing to

step between the mother and child. While doing so would be a courageous and morally responsible act, failing to do so should not give rise to criminal liability. And indeed, I don't think it does under these statutes.

The more troubling aspect of the majority's reading is that it *requires* a person in Staples' position to intercede between the actual parent and her child. There are numerous ways to accomplish that, from physically touching or physically restraining the parent to removing the child from the immediate situation or even from the home to prevent the abuse-all of which are in themselves other criminal acts. If a person were to touch the parent (such as by restraining, pushing, or even hitting), the person has likely committed at least assault in the fourth degree, KRS 508.030, or menacing, KRS 508.050, and possibly second-degree unlawful imprisonment, KRS 509.030. And if the person removes the child, he has committed at least custodial interference, KRS 509.070, if not kidnapping, KRS 509.040(1)(f). While such a person would likely have a defense, such as protection of others, KRS 503.070, choice of evils, KRS 503.030, or prevention of a crime, KRS 503.100, he could nevertheless be charged with a potentially serious crime and face trial. Thus, if the majority's reading stands, it requires a person to choose between committing one crime that is covered by a statute only through a tortured reading or a crime that is clearly covered by statute and to which he *might* have a defense. Both options cannot expose the person to criminal liability. Otherwise, he faces a penalty, one way or the other, solely for another person's conduct—without being an accomplice or a facilitator.

The majority buttresses its reading of the statute by pointing out that several other states have read similar statutes to

extend liability to live-in boyfriends and step-parents. First, such interpretations in other jurisdictions are at best persuasive authority and do not bind this Court.

Second, many of the statutes interpreted by those courts are actually very different from our own. For example, in the case discussed at length by the majority, *Hawkins v. State*, 910 S.W.2d 176, 178 (Tex. App.1995), the statute premised liability on the defendant having "care, custody, or control" of the child, not "actual custody." More importantly, the operative phrase— "care, custody, or control"—is specifically defined in Texas law, and it is defined broadly. *See* Texas Penal Code Ann. § 22.04(d) ("the actor has assumed care, custody, or control if he has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted responsibility for protection, food, shelter, and medical care for a child"). Our statute, of course, includes no such broad definition.

Similarly, the statute in *Commonwealth v. Brown*, 721 A.2d 1105 (Pa.Super.Ct.1998), created liability for a "person supervising the welfare of a child under 18 years of age." *Id.* at 1107 (quoting 18 Pa. Cons.Stat. Ann. § 4304). That too is a broader concept than a person having "actual custody."

And the statute at issue in *Leet v. State*, 595 So.2d 959 (Fla.Dist.Ct.App.1991), had no requirement of "custody," "care and control," "actual custody," or any similar term. Instead, the question of the defendant's liability turned on whether he, as a non-parent, could "permit" the child to be abused. *Id.* at 962. Again, our statute is very different.

And at least one other case cited by the majority found liability under a wholly different theory than simply being a custodian (real, actual, legal, or otherwise). *See Commonwealth v. Torres*, 442 Mass. 554, 813 N.E.2d 1261, 1272 (2004) (premising liability on principal and "joint venture" theories, the latter of which is very much like our complicity liability, not on a statute giving rise to liability for failing to stop another person from inflicting abuse).

The net effect of the majority opinion is that it criminalizes a person's respect for a parent's right to control his or her child without interference from a third party— despite that right having constitutional protection. While child abuse is not included within that protection, the majority's reading of the statute places the burden of deciding when the line is crossed from control to cruelty and abuse on the third party. That cumbersome legal duty has no footing in the statutory language.

I agree that there is a moral duty to intercede in such a situation, but that does not give rise to a legal duty. Because Staples had no actual custody, he could not have committed criminal abuse under a permitting-abuse theory. Additionally, he did not have a legal duty to prevent such abuse sufficient to give rise to accomplice liability for the child's death.

To reach this latter conclusion, however, I must also conclude that a legal duty does not arise elsewhere. The majority does not address this because it finds a legal duty in the criminal abuse statutes, but I find that Staples also had no other legal duty.

The question of complicity liability arising from a person's legal duty to prevent another person's violence against a child has been addressed in a series of cases from this Court. In the first of these cases, *Knox v. Commonwealth*, 735 S.W.2d 711 (Ky.1987), the defendant, who was the mother of the child victim, was convicted of complicity to rape for failing to prevent the child's father from raping the child. The Court held, that a mother had no

affirmative legal duty to intervene to prevent her daughter's rape. *Id.* at 712. The Court noted that it knew of "no higher moral duty than that of preventing such a crime," but that "a *moral* duty to take affirmative action is not enough to impose a *legal* duty to do so." *Id.* at 711–12 (citing 1 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* 284 (1986)) (emphasis added). The Court could not find that such a duty existed in either the criminal statutes or in the common law.

However, the Court reversed *Knox* with respect to parents in *Lane v. Commonwealth*, 956 S.W.2d 874, 875–76 (Ky.1997), holding that a mother has a legal duty to make a reasonable attempt to prevent her boyfriend from committing assault against her child. In that case, the mother was prosecuted for assault under a complicity theory (rather than criminal abuse as a principal under a permitting-abuse theory). While five members of the Court agreed that a legal duty existed sufficient to create accomplice liability, no majority could agree as to the source of the duty.

Three justices agreed that the source of the duty was KRS 620.010, the child-abuse reporting statute. The plurality stated that this statute "creates an affirmative duty for the parent of a child to prevent such physical injury which would result in an assault on that child." *Id.* at 875. Though the plurality also cited and discussed other statutes—KRS 405.020 (the nurturing statute), and KRS 508.100 *et seq.* (the criminal abuse statutes)—it declined to find a legal duty from those statutes alone, though they clearly informed the justices' understanding of the reporting statute.

The other two concurring justices agreed that a parent has a legal duty to prevent harm, but found that it arose from the "special relationship" between a legal custodian and a child. *Id.* at 877 (Cooper, J., concurring). The concurring justices found that this special relationship (and concomitant legal duty) was found both in the common law and in the nurturing statute and criminal-abuse statutes creating liability for allowing abuse to occur to a child in one's actual custody. *Id.* at 881.

Recently, this Court reiterated the core holding of *Lane* that a parent can be held criminally liable under a legal-duty theory of crime against his or her child.[16] *Bartley v. Commonwealth*, 400 S.W.3d 714, 729 (Ky.2013). Specifically, this Court stated "that even the violent acts of a third person can implicate a parent's duty under KRS 405.020 to nurture his or her child and that breaches of that duty can, at least in conjunction with other indications that the General Assembly intended criminal sanctions, amount to criminal conduct." *Id.* Such liability springs from a legal duty, which in turn springs from the parent-child relationship.

Of course, Appellant was not the child's father in this case. He was only the mother's boyfriend, and had no relationship with the child other than living in the same household and caring for her some of the time. Appellant had no other formal or

---

**16.** Technically, the Court did not address the notion of complicity under a legal-duty theory, and instead addressed direct liability under a legal-duty theory where the criminal act can be an "omission to perform a duty which the law imposes upon [a person] and which he is physically capable of performing." *Bartley v. Commonwealth*, 400 S.W.3d 714, 729 (Ky.2013) (quoting KRS 501.030(1)).

Still, the concept—criminal liability based on a duty to prevent harm—is the same. The existence of direct or principal liability under KRS 501.030 for failing to perform a legal duty, however, suggests that there is some redundancy in the complicity statute's also creating liability, albeit accomplice liability, for failing in a legal duty.

legal relationship with the child. Thus, the legal duty of a parent to a child as laid out in *Bartley* and *Lane* is not applicable here.

The question, then, is whether a legal duty to prevent harm exists outside the parent-child relationship when the defendant does not have actual custody of the child. The concurring justices in *Lane* suggested that it does, but again only in limited circumstances, namely, where there is a "special relationship," such as legal custody. *Lane*, 956 S.W.2d at 877 (Cooper, J., concurring). Thus, for the concurring justices, liability could extend to a governmental entity having custody of a child. *Id.*

Staples, however, did not have legal custody or anything approaching a formal or legal relationship of any kind with the child. It would be a great leap to hold that the same legal duty exists for a parent and a person with no legal relationship or kinship to the child, and is not at the time of the crime acting *in loco parentis* or with some other legal status toward the child. While *Lane* overruled *Knox* to the extent that it said a *parent* has no duty to protect a child, the statement in *Knox* that "a *moral* duty to take affirmative action is not enough to impose a *legal* duty to do so," *Knox*, 735 S.W.2d at 711–12 (emphasis added), remains an unwavering tenet of criminal law.

Indeed, as to homicide specifically, this Court recently stated:

> The law recognizes that under some circumstances the omission of a duty owed by one individual to another, where such omission results in the death of the one to whom the duty is owing, will make the other chargeable with [homicide]. *This rule of law is always based upon the proposition that the duty neglected must be a legal duty, and not a mere moral obligation.* It must be a duty

imposed by law or contract, and the omission to perform the duty must be the immediate and direct cause of death.

*Bartley*, 400 S.W.3d at 724 (quoting *West v. Commonwealth*, 935 S.W.2d 315, 317 (Ky.App.1996)) (alteration in original, emphasis added); *see also* Wayne R. LaFave, *Substantive Criminal Law* § 6.2 (2012) ("For criminal liability to be based upon a failure to act it must first be found that there is a duty to act—a legal duty and not simply a moral duty."). For that reason, this Court has usually been careful not to impose a legal duty when one has not been clearly defined by statute or delineated by the common law.

Staples had neither actual custody of the child victim nor a special or other relationship with her that might have given rise to a legal duty to protect her. He therefore cannot be convicted under a complicity theory based on his duty to prevent harm to the child.

Again, I recognize that there would be a clear *moral* duty to intercede in such a case. That Staples would deserve the most damning moral opprobrium and condemnation had he failed to try to stop the mother is without question. But moral duties do not *per se* equate to legal duties.

Unlike the Court in *Knox*, I cannot find a statutory or common law source for a legal duty on Staples, who was not a parent or custodian of the child at the time of the fatal injuries. However morally deplorable his conduct may have been if he failed to prevent the mother from engaging in the conduct that led to her daughter's death, Staples had no legal duty to prevent such conduct.

Finally, there was little if any evidence, at least as described in the briefs, that Staples was present for any abuse committed by the mother. At best, the evidence showed that he was present in the apart-

ment when the abuse occurred, but he easily could have been in another room and not seen the mother's conduct. Thus, beyond the legal failings of the majority's view of Staples' liability, there appear to have been substantial evidentiary flaws in that portion of the Commonwealth's case. Based on the briefs, this appears to have been another ground on which to reverse Staples' convictions. And given that there was evidence to directly implicate Staples as the actual perpetrator of the abuse, including a jailhouse confession to another inmate that he was rough with the child and hated her because she was not his, there was no valid reason to pursue a complicity charge.

To reiterate, the Commonwealth's theory that Staples had actual custody of the child and thus committed criminal abuse by allowing the child's mother to abuse the child is legally unsupported. Similarly, the Commonwealth's theory that Staples had a legal duty arising from his actual custody to prevent the child's mother from killing her and thus was complicit to manslaughter is legally unsound. Because the jury instructions included these theories, the convictions should be reversed.

VENTERS, J., joins.

VENTERS, J., Concurring in Part and Dissenting in part.

I join Justice' Noble's separate opinion because I agree with her view as to the meaning of "actual custody" in the context under review here. But, I write separately to highlight an additional flaw of the majority opinion. Because "actual custo-dy" of the abused child is an essential element of first-degree criminal abuse under KRS 508.100, the jury was expressly instructed that it had to believe Staples had "actual custody" of his girlfriend's child when the injury occurred. As the majority clearly acknowledges, the meaning of "actual custody" is not obvious and, in fact, the majority devotes several pages of its opinion explaining its conception of "actual custody."

However, this new articulation of "actual custody" is of no import unless the jury charged with determining Staples' guilt was made aware of it. The jury, however, was never instructed to apply this new definition of "actual custody" and, we have no idea what meaning the jury may have ascribed to that phrase. Moreover, we have no reason to believe that the jury unanimously settled upon the same meaning of "actual custody" as decreed in the majority opinion, thereby casting serious doubt upon whether Appellant's criminal abuse conviction was pursuant to a unanimous verdict. See *Kingrey v. Commonwealth*, 396 S.W.3d 824, 830 (Ky.2013), quoting KRS 29A.280(3) ("A unanimous verdict is required in all criminal trials by jury.").[17] Having established the definition of a term to dispel the inherent ambiguity of the statutory language, it is now incumbent upon the majority to remand the case for retrial based upon instructions consistent with this newly formulated definition. That is exactly what we did in *McClellan v. Commonwealth*, 715 S.W.2d 464, 468 (Ky.1986) when this Court fashioned a definition for the statutory term "extreme emotional disturbance," which

---

**17.** The Majority's suggestion that Appellant is not entitled to a new trial because he did not request a definitional instruction is unpersuasive. This position is in diametric opposition to our well established rule that "erroneous jury instructions are presumed to be prejudicial. And the right to a unanimous verdict is a substantial right; the violation of which we have held requires reversal. So the denial of [Appellant's] right to a unanimous verdict is a fundamental error." See *Kingrey*, 396 S.W.3d at 831–32 (citations and internal quotes omitted).

like "actual custody," is used, but not defined, in the criminal statutes. The failure of the majority to afford Staples a trial based upon its newly articulated conception of "actual. custody" is a violation of his fundamental due process rights under the Fifth and Fourteenth Amendments of the United States Constitution. *Middleton v. McNeil,* 541 U.S. 433, 437, 124 S.Ct. 1830, 158 L.Ed.2d 701 (U.S.2004) ("In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement."). Absent a definition of "actual custody" for the jury to apply, I am unable to understand how the Commonwealth could have proven this element of first-degree criminal abuse. To the contrary, this element may only be proven by a new trial applying the definition of "actual custody" the Majority adopts today.

NOBLE, J., joins.