# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: NOVEMBER 2, 2017
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2016-SC-000183-MR

JARROD WEISS                              APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE MITCH PERRY, JUDGE
NOS. 14-CR-002387-01 and 14-CR-002531

COMMONWEALTH OF KENTUCKY              APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

On the afternoon of April 27, 2011, in Louisville, Kentucky, Tanner Browning was spending time with friends in his apartment. Around the time Tanner's guests were departing, Appellant, Jarrod Michael Weiss, who lived in the same apartment complex, parked his vehicle in front of Tanner's apartment. At that time, Appellant displayed his new stereo system for Tanner and his friends. Eventually, Tanner's friends left, while Tanner and Appellant remained together in the parking lot. What occurred thereafter is unknown. However, later that evening, Isaac Clark, a neighbor and friend of Tanner's, observed Tanner's patio door ajar. Clark grew concerned and decided to enter

the apartment to check on Tanner. Clark discovered Tanner's lifeless body lying inside his apartment bedroom. Tanner died from a fatal gunshot wound.

The Saint Matthews Police Department quickly focused on Appellant as the culprit. Countless witnesses confirmed that Appellant was the last individual seen with Tanner. Police also uncovered that Appellant had purchased a stolen gun from Tanner's roommate. Yet, law enforcement had virtually no physical evidence tying Appellant to the crime, so no arrest was made for several years. Eventually, Appellant's wife, Lavonna Blount, her brother, Gerald Blount, and her sister-in-law, Ashley Blount, came forward and told detectives that Appellant had confessed to murdering Tanner. All three witnesses indicated that Tanner owed Appellant money for marijuana and that Appellant went to Tanner's to retrieve the money. When Tanner could not produce the money, Appellant closed his eyes and shot Tanner. Appellant then returned to his apartment where he cut up his pants and attempted to flush the cuttings down the toilet. Appellant also disposed of the gun.

On September 15, 2015, a Jefferson County Grand Jury indicted Appellant for one count each of murder and tampering with physical evidence. A two-week trial commenced on January 4, 2016, during which thirty-seven witnesses testified. Ultimately, the Jefferson Circuit Court Jury found Appellant guilty on both charges, in addition to being a persistent felony offender in the second degree. The trial court sentenced Appellant in conformity with the jury's recommended sentence of thirty years'

2

imprisonment. Appellant now appeals his conviction and sentence as a matter of right pursuant to § 110(2)(b) of the Kentucky Constitution.

### *Davis' Testimony*

Appellant's first assignment of error concerns the testimony of Donovan Davis. Prior testimony revealed that John Devereaux burglarized Davis' vehicle and recovered a .45 Glock. Devereaux then sold the stolen gun to Appellant. The Commonwealth theorized that the stolen .45 Glock was the murder weapon. However, the stolen Glock was never recovered. Thusly, evidence was presented during the trial that both supported and contradicted the Commonwealth's murder weapon theory. In support, evidence showed that the bullets loaded into the stolen gun were the same type recovered from the crime scene. More specifically, Davis testified that he had loaded Remington Golden Saber, 185-grain, hollow-point bullets into the gun prior to its theft. KSP ballistics expert, Leah Collier, testified that a Remington hollow-point bullet and casing were recovered from the crime scene.

The Commonwealth's murder weapon theory, however, had a significant flaw. According to Davis, the Glock manufacturer had shipped him the gun along with two shell casings that were test fired at the point of assembly. Essentially, the Glock manufacturer provides the buyer with two casings fired from the purchased gun. Davis provided law enforcement with the test-fired casings in order for them to be compared to the shell casing recovered from the crime scene. Ms. Collier was unable to make a conclusive match between the test-fired casings and the one recovered from Tanner's apartment. Two

3

independent ballistics experts also testified that the test-fired casings did not match the casing found at the scene.

The Commonwealth attempted to reconcile the inconsistencies in its theory by disclosing to the jury an off-the-record remark made by one expert, Kelly Fite. He stated that Glock manufacturers are notorious for not properly matching the test-fired casings with the correct gun. In other words, the test-fired casings that Davis provided may have been fired from a different Glock, not the actual Glock he purchased. This would explain why experts could not match the test-fired casings with the murder weapon.

With this information in mind, we turn to Appellant's first argument regarding Davis' testimony. Appellant takes aim at the trial court's allowance of Davis' statements that Appellant claims were improperly presented to the jury as expert opinions. More precisely, Davis testified that the .45 Remington hollow-point bullets he loaded into the Glock prior to its theft were rare ammunition not easily accessible to the public. When prompted by the Commonwealth to discuss the ammunition's availability, Appellant objected on the grounds that the answer would be inadmissible expert testimony from a lay witness. The trial court overruled Appellant's objection, explaining that Davis' testimony was factual and not an expert opinion. The Commonwealth continued its questioning by asking Davis, in his personal experience purchasing ammunition, how many types of .45 caliber ammunition and bullet weights were available to purchase and which type of bullet was the most common. Davis' answers demonstrated that in his extensive history of

4

purchasing ammunition, the bullets he had loaded into his gun prior to its theft were the least common forms of ammunition for his particular .45 Glock.

In order to determine the admissibility of Davis' testimony, we look to Kentucky Rules of Evidence ("KRE") 701. This rule limits opinion testimony by a lay witness to that which is, *inter alia*, "[r]ationally based on the perception of the witness . . . [and] [n]ot based on scientific, technical, or other specialized knowledge within the scope of Rule [KRE] 702." This is not to say that lay witnesses can never provide testimony on a subject that is technical in nature, so long as their opinions are based on sufficient life experiences. *Mondie v. Commonwealth*, 158 S.W.3d 203, 212 (Ky. 2005) ("The degree to which a witness may give an opinion, of course, is predicated in part upon whether and the extent to which the witness has sufficient life experiences that would permit making a judgment as to the matter involved."). In the case before us, Davis had corresponding life experience buying and utilizing ammunition. His testimony indicated that he was a firearms instructor who had purchased guns and ammunition since his teenage years. Furthermore, his testimony was focused entirely on his personal experience buying ammunition for his own gun. *See Hunt v. Commonwealth*, 304 S.W.3d 15 (Ky. 2009). Accordingly, we cannot find that the trial court abused its discretion, as Davis' testimony was not based on scientific, technical, or specialized knowledge, rather his own personal experiences.

Appellant also argues that Davis' testimony was inadmissible pursuant to KRE 403. At the close of the Commonwealth's case-in-chief, Appellant

5

moved for a mistrial on the grounds that Davis' testimony regarding the stolen Glock and test casings was more prejudicial than probative. The crux of Appellant's argument to the trial court was that there was no connection between Davis' stolen gun and the murder weapon. Consequently, Davis' testimony concerning the Glock warranted a new trial.

KRE 403 requires a trial court to exclude evidence when its probative value is substantially outweighed by the danger of undue prejudice. To begin our analysis, we find that Davis' testimony had substantial probative worth. While the Commonwealth was unable to prove an exact match of the test-fired casings and the crime scene casing, it provided sufficient proof connecting Davis' stolen gun to the crime. For instance, Appellant had purchased Davis' stolen gun from Deveraux, and the bullet and casing found at the crime scene was the same type of bullet Davis had loaded into his gun prior to its theft. In addition, Davis' testimony regarding the stolen Glock did not cause Appellant to suffer undue prejudice. This Court discussed the meaning of undue or unfair prejudice in *Ten Broeck Dupont, Inc. v. Brooks,* 283 S.W.3d 705, 716 (Ky. 2009), wherein we stated the following:

> Evidence is unfairly prejudicial only if . . . it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case.

(internal quotations and citations omitted). We do not believe Davis' testimony led the jury to decide the merits of the case on anything other than the evidence presented. Accordingly, we cannot say that the trial court abused its discretion in allowing Davis' testimony.

6

### Fite's Off-the-record Statement

We now turn back to the off-the-record statements made by Kelly Fite. Appellant claims such statements constituted inadmissible hearsay. We agree.

After KSP ballistics testing was unable to match the crime scene casing with the test-fired casings, they were sent to Fite, a Georgia based ballistics expert. Fite submitted a one-page report confirming that the casing from the crime scene was not fired from the same firearm that shot the casings from the test weapon—the stolen Glock. Fite was not subpoenaed to testify at trial. Instead, his report was introduced without objection to the jury through Detective Napier's testimony. During his testimony, the Commonwealth asked Detective Napier whether Fite had expressed any concerns that the test-fired casings were actually fired from a different Glock than the one shipped to Davis. Detective Napier revealed that he had "an off-the-record" conversation with Fite, during which Fite stated that the Glock manufacturers often fail to provide the correct test-fired casings. Since that statement by Fite was not in the written report, Appellant objected to Fite's off-the-record statements on the grounds of hearsay. The trial court overruled the objection without specifying its reasoning.

Without doubt, Detective Napier's statements recounting his off-the-record conversation with Fite constituted hearsay within meaning of KRE 801, and qualified for no exception. More importantly, and as the Commonwealth concedes, allowing Detective Napier to recount the off-the-record conversation violated Appellant's right to confrontation under the Sixth Amendment to the

7

United States Constitution and Section 11 of our Kentucky Constitution. *See Crawford v. Washington,* 541 U.S. 36 (2004) (U.S. Supreme Court declared that out-of-court testimonial statements where the declarant is unavailable are categorically barred from admission under the Constitution unless the defendant had a prior opportunity to cross-examine the witness). Our focus, then, is whether this constitutional violation was harmless beyond a reasonable doubt. *Whittle v. Commonwealth,* 352 S.W.3d 898, 905-06 (Ky. 2011) (citing *Chapman v. California,* 386 U.S. 18, 22, 24 (1967)). Accordingly, the Court must determine "whether the improper evidence was of a weight, was of a striking enough nature, or played a prominent enough role in the Commonwealth's case to raise a reasonable possibility that it contributed to the conviction." *Staples v. Commonwealth,* 454 S.W.3d 803, 827 (Ky. 2014).

In reviewing the evidence as a whole, we believe there was substantial proof of Appellant's guilt presented to the jury. Numerous witnesses testified that Appellant was the last individual with Tanner, as close as thirty minutes preceding his death. Three witnesses testified that Appellant confessed to murdering Tanner. All three witnesses' accounts of Appellant's confessions were corroborated by other evidence. This included the fact that Tanner owed Appellant money for drugs, Appellant had a loaded gun, and Appellant tried to flush his cut-up pants down the toilet—the latter corroborated by the property manager having to fix the plumbing. Moreover, Detective Napier's statement concerning the off-the-record conversation was brief and added little insight into whether the casings were fired from the same gun. We believe most logical

8

jurors would have considered the possibility that the Glock manufacturer mismatched the test-fired casings with the purchased gun, even absent Fite's statement. Therefore, absent Detective Napier's inadmissible statements, our evaluation of the remaining evidence reveals, beyond a reasonable doubt, that a conviction would have ensued.

### Detective Ball's Testimony

Appellant complains that the trial court committed reversible error when it allowed Detective Ball, the lead investigator, to express inadmissible opinion testimony and hearsay, in violation of KRE 701. Appellant takes aim at the Commonwealth's questioning which induced Detective Ball to inform the jury that Appellant was the exclusive suspect in his investigation. As his testimony unfolded, the Commonwealth asked Detective Ball if he told Appellant, "I think you're my shooter." When Detective Ball answered in the affirmative, the Commonwealth inquired as to his reasoning. As Detective Ball recounted, he interviewed a bevy of witnesses which revealed no additional suspects. Appellant objected to the testimony on the grounds that Detective Ball was providing improper opinion testimony that Appellant was guilty of murder. Moreover, Appellant claimed that Officer Ball's conclusion was based on the hearsay statements of his investigative witnesses.

First, the Court finds no error in the trial court's ruling that Detective Ball's testimony was proper lay testimony. Detective Ball did not recount any specific conversations or statements made during the interviews. He merely made a broad statement concerning the investigation in order to explain why

9

he told Appellant, "I think you're my shooter." The thoroughness of any criminal investigation is always at issue and his comments simply showed that his investigation did not yield additional suspects. Accordingly, we find that Detective Ball's statements were rationally based on his own perceptions from the investigation, and were helpful in clarifying the process and scope of the investigation.

While this Court does not believe Detective Ball's testimony was inadmissible by virtue of KRE 701, we do find that his testimony amounted to inadmissible hearsay. As defined in KRE 801(c), hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." The Commonwealth believes Detective Ball's testimony does not constitute hearsay since he did not recount specific, out-of-court witness's statements. However, by explaining that none of the interviewees disclosed additional suspects, Detective Ball was providing a summary of the out-of-court interviews. As we explained in *Dickerson v. Commonwealth,* 485 S.W.3d 310, 325 (Ky. 2016), "[m]erely summarizing hearsay statements does not change their hearsay character." Additionally, Detective Ball's summation of the out-of-court interviews was certainly provided to prove the truth of the matter asserted—that Appellant was the sole suspect. Further support for our holding is found in *Sanborn v. Commonwealth,* 754 S.W.2d 534, 542 (Ky. 1988), wherein the Court determined that a police officer's conclusion that "he did not obtain any information from the people whom he interviewed verifying the appellant's alibi" was inadmissible hearsay. Nonetheless, and as is provided in the

10

proceeding discussion, we find the error harmless, as the declarants of the hearsay statements all testified to those accounts during the trial.

Now that we have addressed the trial court's improper admission of the hearsay statements, we turn to Appellant's constitutional claim. Detective Ball's inference that the numerous interviews he conducted failed to point to anyone other than Appellant as the culprit placed Appellant's constitutional right to confrontation at issue. Whether Officer Ball's testimony summarizing his interviews violated Appellant's confrontation rights turns on three questions: (1) Were the out-of-court statements testimonial? (2) Were the declarants unavailable to testify? (3) Did Appellant have an opportunity to cross-examine the declarants? *Dickerson*, 485 S.W.3d at 327.

As to the first question, we can easily conclude that the out-of-court statements were testimonial. They were given to Detective Ball during the course of an investigation regarding past events relevant to a subsequent criminal prosecution. *See Crawford,* 541 U.S. at 68. However, Appellant's constitutional claim fails the second and third questions, as twenty police interviewees testified during Appellant's trial. Indeed, the interviewees who Detective Ball referred to in his hearsay conclusion, testified during the trial and were subject to vigorous cross-examination. Thusly, we cannot opine that Appellant's right to confront those witnesses was violated. *See Dickerson,* 485 S.W.3d 310 (holding that defendant's confrontation rights were not violated when detective summarized witness interviews because four of the interviewees testified and were subject to cross-examination at trial).

11

Appellant's fifth assignment of error also regards Detective Ball's testimony. Appellant complains of Detective Ball's recitation of a transcript in which Detective Hunt interviewed Appellant. During the interview, Detective Hunt makes several comments to Appellant that his ability to make specific findings during the investigation was "a God thing." In essence, Appellant is complaining that Hunt is implying that his investigation leading to Appellant was divinely guided. Appellant objected to the transcript being read to the jury and motioned the Court to redact Detective Hunt's references to God. The trial court overruled Appellant's objection and allowed Detective Ball to read the unredacted transcript.

Appellant cites *Brown v. Commonwealth*, 983 S.W.2d 513 (Ky. 1999), to support his contention that Detective Hunt's references to God amounted to impermissible bolstering of the detective's credibility. We disagree and believe *Brown* is distinguishable. In *Brown,* the Court found error in the trial court's allowance of a witness to testify while holding a Bible. *Id.* at 515. In that case, we held that allowing the witness to testify to his assertions while holding a Bible carried a likelihood of prejudice to Appellant's version of events.

This case is not comparable. Detective Hunt's claims that his investigatory findings were "a God thing" does not bolster his credibility to Appellant's detriment. His testimony regarding "a God thing" referenced two specific findings of his investigation. One, that Appellant cut up the pair of Khaki pants he was wearing on the night of the shooting and attempted to flush them down the toilet. Appellant's cut-up pants were discovered by virtue

12

of his toilet being clogged. In viewing Detective Hunt's statements, he was alluding to the fact that those pieces of Appellant's pants were recovered by the unusual event of the toilet being clogged to such a degree that apartment maintenance had to rectify the problem. Regardless of Detective Hunt's inference, there was no dispute that Appellant's pant cuttings were discovered upon the clogging of his toilet.

Second, Detective Hunt referred to it being "a God thing" in his ability to not only discover that Appellant had purchased a stolen gun, but that the shell casing found at the crime scene was consistent with a bullet fired from the stolen gun. This fact too was not a source of contention during the trial. Consequently, whether such an act was "a God thing" had no prejudicial effect on Appellant's defense. We find no error.

Furthermore, Detective Hunt's references to God did not rise to the level of improperly interjecting religion into the court proceedings. *See Soto v. Commonwealth,* 139 S.W.3d 827, 874 (Ky. 2004) (prosecutor's reference to the jury's "prayerful deliberations" was not error); *see Eldred v. Commonwealth,* 906 S.W.2d 694, 707 (Ky. 1994), *overruled on other grounds by Commonwealth v. Barroso,* 122 S.W.3d 554, 563–64 (Ky. 2003) (Commonwealth's biblical references, and statement that decedent was killed as "God intended him to be," did not amount to error).

13

### 404(b) Evidence

Appellant's next argument is that the trial court impermissibly allowed bad character evidence during the trial, in violation of KRE 404(b). Appellant directs the Court to the testimony of two witnesses.

We will first address the testimony of Connor Luvisi, a friend of Tanner's. According to Luvisi, he spoke with Tanner shortly before his death on his cell phone. Tanner explained that he was sitting at his apartment with Appellant. The Commonwealth then commenced with the following line of questioning:

Commonwealth: Were you in debt to [Appellant] at that point?

Luvisi: Yes, for about $60 dollars.

Commonwealth: After talking to Tanner, do you remember calling [Appellant]?

Luvisi: Yeah. I immediately called him. I was afraid I was going to get beat up, or jumped, or something because I owed him money as well. And, Tanner said that he was there with him and I was headed that way.

Appellant immediately objected to Luvisi's testimony on the grounds that Tanner's statement that Appellant was at his apartment was hearsay. The trial court sustained Appellant's objection, after which Appellant moved for a mistrial. The trial court denied Appellant's motion and no admonition was requested. Now, on appeal, Appellant argues for the first time that the above testimony constituted bad character evidence in violation of KRE 404(b). Per his brief, Appellant seems to argue that Luvisi's testimony demonstrated that Appellant was a violent man that would physically harm him over the debt.

14

Since this argument was not preserved for the trial court, we will conduct a palpable error review pursuant to RCr 10.26.

The invocation of KRE 404(b), as an exclusionary rule, is contingent on the Commonwealth offering into evidence proof of an actual crime, wrong, or act. Here, Luvisi merely testified that he was afraid he was going to be harmed by Appellant over the debt. He did not substantiate his claim with anything other than his personal belief. The Commonwealth did not ask further questions on the matter, nor did it offer any proof that Appellant had threatened Luvisi. Since Luvisi's fear of being harmed by Appellant does not constitute evidence of a crime, wrong, or act, Appellant has failed to demonstrate that he has suffered a manifest injustice requiring reversal of his convictions by virtue of KRE 404(b).

Appellant also complains that impermissible 404(b) evidence was elicited during Lavonna Blount's testimony. On cross-examination, Appellant began questioning Lavonna about her seemingly long criminal history. At one point, Lavonna explained that her conviction of complicity to burglary in the third degree was obtained "with [Appellant]." Appellant objected on KRE 404(b) grounds and once again moved for a mistrial. The trial court sustained Appellant's objection, but denied his motion. Appellant did not request an admonition.

Trial courts have wide discretion when determining whether to grant or deny a motion for a mistrial. *Shabazz v. Commonwealth*, 153 S.W.3d 806, 810 (Ky. 2005). Considering that a mistrial is an extreme remedy, it should be

15

resorted to only when there is "a manifest necessity for such an action . . . ." *Bray v. Commonwealth*, 68 S.W.3d 375, 383 (Ky. 2002) (quoting *Skaggs v. Commonwealth*, 694 S.W.2d 672, 678 (Ky. 1985)).

While it was error for Lavonna to disclose Appellant's prior crime, not all references to prior bad acts are prejudicial enough to warrant a mistrial. *See Turner v. Commonwealth*, 153 S.W.3d 823, 829-30 (Ky. 2005), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336, 345 (Ky. 2010). Indeed, mistrials are generally unnecessary when the prejudicial effect of a prior bad act can be obviated through the use of an admonition. *Jacobsen v. Commonwealth*, 376 S.W.3d 600, 609-10 (Ky. 2012). Here, Lavonna's statement disclosed that Appellant participated in third-degree burglary. The information was part of cross-examination by Appellant, not from evidence solicited by the Commonwealth. While this prior charge was unrelated to the prosecution at hand, it was minor compared to the murder charges Appellant was facing. In light of the totality of the evidence presented to the jury, the "effect of the inadmissible evidence w[as] [not] devastating" to Appellant. *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003). Accordingly, we find no error in the trial court's denial of Appellant's motion for a mistrial.

### Prosecutorial Misconduct

Next, Appellant argues that he was denied a fair trial due to the Commonwealth's misconduct during its closing arguments. There are two distinct comments that Appellant placed in issue. First, Appellant objected to the Commonwealth's statement to the jury that "after waiting almost five years,

16

[Tanner's] family deserves justice for what [Appellant] did." Appellant also complains of the Commonwealth's following statement to the jury: "If you're sitting there in your mind thinking, I know he did it. . . that's what proof beyond a reasonable doubt [inaudible] . . . ." After Appellant's objection, the prosecutor revised his statement, saying "it is upon you to deicide, beyond a reasonable doubt, what that means."

In determining whether a prosecutor's conduct rises to the level of prosecutorial misconduct, we must decide whether the conduct was of such an "egregious" nature that it denied the defendant his constitutional right of due process of law. *Slaughter v. Commonwealth,* 744 S.W.2d 407, 411-12 (Ky. 1987) (citing *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). We have consistently emphasized that "[g]reat leeway is allowed to *both* counsel in a closing argument." *Slaughter,* 744 S.W.2d at 412 (emphasis in original). Moreover, "[i]f the misconduct is objected to, we will reverse on that ground if proof of the defendant's guilt was not such as to render the misconduct harmless, and if the trial court failed to cure the misconduct with a sufficient admonition to the jury." *Murphy v. Commonwealth,* 509 S.W.3d 34, 49 (Ky. 2017) (quoting *Duncan v. Commonwealth,* 322 S.W.3d 81, 87 (Ky. 2010)).

As to the Commonwealth's statement that Tanner's family deserves justice, there is certainly concern that it aroused sympathy for the victim's family. *See Sanborn,* 754 S.W.2d at 542–43. In addition, we find it apparent that the Commonwealth's statement concerning reasonable doubt teetered on the line of impermissibly defining the term. *See Commonwealth v. Callahan,*

17

675 S.W.2d 391, 393 (Ky. 1984) (in closing arguments, counsel should "refrain from any expression of the meaning or definition of the phrase 'reasonable doubt.'"). Nevertheless, we do not believe either statement crossed the line of reversible error, as they did not render Appellant's trial fundamentally unfair. As we have already outlined, proof of Appellant's guilt was substantial. In light of the evidence against him, we have no doubt that the Commonwealth's fleeting statements, assuming they evoked prejudice, did not contribute to the ultimate verdict of guilt.

### RCr 7.26

Appellant's eighth assignment of error is that the trial court violated RCr 7.26 when it allowed late notice of a witness's inculpatory statements. This issue arose on the fifth day of trial.

Witness, Travis Leseman, claimed that he was smoking a cigarette in his car in front of the victim's home late in the evening on the night in question. Per his earlier written statement, which had been produced to the defense counsel, the Commonwealth expected Leseman to only testify that he witnessed Clark enter Tanner's apartment and leave shortly thereafter in an obvious state of panic. This was intended to buttress Clark's account that he went to Tanner's apartment and saw him dead. However, on the morning that Leseman was scheduled to testify, he informed the Commonwealth that he had also witnessed Appellant leaving Tanner's apartment. Leseman claimed that he did not disclose this information during his previous interview because he did not realize its significance until later.

18

At that time, the Commonwealth immediately informed the trial court and defense counsel of Leseman's additional expected testimony. The Commonwealth asserted that it had no prior knowledge that Leseman observed Appellant leaving Tanner's apartment that night. Appellant objected to Leseman being able to provide the inculpatory testimony. Yet, the trial court held that it would allow Leseman's testimony since the Commonwealth had disclosed the substance of his new statements at the earliest opportunity. The trial court provided Appellant with a two-hour continuance. Leseman was vigorously cross-examined by Appellant regarding his failure to come forward with the information earlier.

RCr 7.26(1) provides that "[e]xcept for good cause shown, not later than forty-eight (48) hours prior to trial, the attorney for the Commonwealth shall produce all statements of any witness in the form of a *document or recording* in its possession which relates to the subject matter of the witness's testimony . . . ." (Emphasis added). In *Yates v. Commonwealth,* 958 S.W.2d 306, 308 (Ky. 1997), we explained that under RCr 7.26(1), only written witness's statements must be provided to defense counsel prior to trial. Thusly, since Mr. Leseman's new-found claims were made shortly before trial and were unrecorded, RCr 7.26(1) has no applicability. Furthermore, the Court made clear in *Yates* that a witness's additional testimony concerning details not made within the "four corners" of the written statement do not implicate RCr 7.26(1).

Even assuming, *arguendo,* that there was an RCr 7.26 violation, reversal would be unwarranted considering Appellant was not prejudiced. *Roach v.*

19

*Commonwealth,* 507 S.W.2d 154 (Ky. 1974) (RCr 7.26 requires reversal only if defendant suffered prejudice). Appellant had time to review the witness's new statements before he testified and was able to effectuate a robust cross-examination, repeatedly highlighting the inconsistencies of the incriminating testimony. We find no error.[1]

### Marital Privilege

Lastly, Appellant argues that reversible error occurred when the trial court allowed his wife, Lavonna, to testify against him. Appellant claims that KRE 504 prohibited Lavonna from testifying against his wishes. The trial court ruled that the exception set forth in KRE 504(c)(1) permitted the testimony. We agree. KRE 504(c)(1) provides that there is no marital privilege "[i]n any criminal proceeding in which the court determines that the spouses conspired or acted jointly in the commission of the crime charged." In the case before us, both Appellant and Lavonna were indicted jointly for tampering with physical evidence stemming from Appellant's attempt to dispose of evidence. Lavonna agreed to plead guilty to the charge in exchange for her testimony against Appellant. Appellant has failed to provide any reason to support his contention that the KRE 504(c)(1) exception to marital privilege is inapplicable.

---

[1]Appellant asserts a minor sub-issue within his argument concerning Leseman's testimony. Appellant complains of the trial court's ruling that he could not introduce a certified copy of a September 2011 petition to evict Leseman from his apartment. Appellant believes this evidence would have somehow impeached Leseman's claims that he moved back to Minnesota immediately following Tanner's murder. The Court fails to see how this evidence would have impeached Leseman. In fact, the petition for forcible entry and detainer demonstrates that Appellant stopped paying his rent on the apartment, thereby supporting his contention that he moved back to Minnesota.

For the foregoing reasons, the judgment of the Jefferson Circuit Court is hereby affirmed.

All sitting. Minton, C.J.; Cunningham, Hughes, Keller, VanMeter, and Venters, JJ., concur. Wright, J., dissents by separate opinion.

WRIGHT, J., DISSENTING: I dissent from the majority opinion, as I do disagree as to the weight of the evidence. Specifically, I do not believe the confrontation clause violation that occurred when Detective Napier improperly testified regarding the ballistic expert's off-the-record statement concerning Glock's propensity to match the proper shell casings with the gun was harmless beyond a reasonable doubt. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24); *e.g. Heard v. Commonwealth*, 217 S.W.3d 240, 244 (Ky. 2007).

In *Staples v. Commonwealth*, this court stated, "[h]armless error analysis applied to a constitutional error, such as the Confrontation Clause violation . . . involves considering the improper evidence in the context of the entire trial and asking whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Staples v. Commonwealth*, 454 S.W.3d 803, 826-27 (Ky. 2014) (internal quotations omitted). Put differently, we have also stated that an error may not be deemed harmless beyond a reasonable doubt unless "there is no reasonable possibility that it contributed to the conviction." *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky. 2009). Thus, we must determine whether there is a reasonable

21

possibility Detective Napier's testimony *might* have contributed to Appellant's conviction—if there is a reasonable possibility that it contributed to the conviction, we cannot find that the error was harmless beyond a reasonable doubt. The majority holds that there is no such reasonable possibility. I disagree.

The majority calls the proof against Appellant "substantial." This proof consisted of witnesses who testified Appellant was the last individual they saw with Tanner, testimony that Tanner owed Appellant money for drugs, the fact that Appellant owned a loaded gun, the fact that he cut up and attempted to flush his pants, and the testimony of three witnesses who testified Appellant had confessed to the murder. First of all, the facts that Appellant was the last person seen with the Tanner, that Tanner owed him money for drugs, and the fact that Appellant owned a loaded gun carry little weight. While bizarre, there is no assertion that the cut-up pants contain any evidence linking Appellant to the crime apart from their very existence. Finally, the three witnesses who testified that Appellant had confessed to the murder did not constitute evidence strong enough to render the erroneously admitted evidence harmless beyond a reasonable doubt.

The three witnesses were Appellant's estranged wife, Lavonna Blount, and Lavonna's brother and his wife, Gerald and Ashley Deem. During the testimony, it was revealed that Lavonna and Appellant were estranged and that she was mad at Appellant for cheating on her. Gerald also admitted to harboring animosity against Appellant. The witnesses' stories differed in the

22

details of the murder and none of them came forward until after Lavonna and Appellant separated. Police had the previously-mentioned circumstantial evidence, but did not arrest Appellant until after Lavonna, Gerald, and Ashley came forward.

Given the lack of physical evidence linking Appellant to the crime, Detective Napier's improper testimony concerning the ballistics expert's off-the-record statement was not harmless beyond a reasonable doubt. In this case, the spent casings which were included in the gun Appellant purchased did not match those found at the crime scene. This could have easily created reasonable doubt in the minds of the jury. However, Detective Napier improperly testified that the ballistics expert stated that Glock manufacturers often fail to provide the correct test-fired casings. The majority is correct in its holding that this testimony violated Appellant's rights under the confrontation clause. However, for the aforementioned reasons, I disagree that this error was harmless beyond a reasonable doubt.

COUNSEL FOR APPELLANT:

Erin Hoffman Yang
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Emily Lucas
Assistant Attorney General